713 F.2d 1384
 ASSOCIATION FOR RETARDED CITIZENS OF NORTH DAKOTA; Lindley
Black, by his father, Sidney Black; Bradley Cossette, by
his mother, Denise Cossette; Richard Schneiderhan, by his
mother and guardian Elmira Schneiderhan; Naomi Jordison, by
her father, Timothy Jordison; Kelli Moriarty, by her mother
and guardian, Jacquelyn Moriarty; and Philip Dechant, by
his mother and guardian, Lois Dechant: on behalf of
themselves and all others similarly situated, Appellees,
v.
Allen I. OLSON, Governor of the State of North Dakota;
Alton L. Lick, Director of Institutions; Milton Wisland,
Superintendent of Grafton State School; Richard Charrier,
Assistant Superintendent of Grafton State School and Chief
Administrative Office of San Haven Division; Dr. M.A.K.
Lommen, State Health Officer, Department of Health; Sam
Ismir, Director, Division of Mental Health, Department of
Human Services; Darvin Hirsch, Director, Division of
Developmental Disabilities, Department of Human Services;
Carroll Burchinal, Director of Department of Vocational
Education; Dr. Joseph Crawford, Superintendent of Public
Instruction; Gary Gronberg, Director of Special Education
Division of Department of Public Instruction; Dale Moug,
Acting Director Department of Human Services; James O.
Fine, Director of Division of Vocational Rehabilitation,
Department of Human Services; Marcellus Hartze, Director of
Division of Community Services, Department of Human
Services, Appellants. (Three Cases)
ASSOCIATION FOR RETARDED CITIZENS OF NORTH DAKOTA; Lindley
Black, by his father, Sidney Black; Bradley Cossette, by
his mother, Denise Cossette; Richard Schneiderhan, by his
mother and guardian Elmira Schneiderhan; Naomi Jordison, by
her father, Timothy Jordison; Kelli Moriarty, by her mother
and guardian, Jacquelyn Moriarty; and Philip Dechant, by
his mother and guardian, Lois Dechant: on behalf of
themselves and all others similarly situated, Appellants,
v.
Allen I. OLSON, Governor of the State of North Dakota;
Alton L. Lick, Director of Institutions; Milton Wisland,
Superintendent of Grafton State School; Richard Charrier,
Assistant Superintendent of Grafton State School and
Chief Administrative Office of San Haven Division;
Dr. M.A.K. Lommen, State Health Officer, Department of
Health; Sam Ismir, Director, Division of Mental Health,
Department of Human Services; Darvin Hirsch, Director,
Division of Developmental Disabilities, Department of Human
Services; Carroll Burchinal, Director of Department of
Vocational Education; Dr. Joseph Crawford, Superintendent
of Public Instruction; Gary Gronberg, Director of Special
Education Division of Department of Public Instruction;
Dale Moug, Acting Director Department of Human Services;
James O. Fine, Director of Division of Vocational
Rehabilitation, Department of Human Services; Marcellus
Hartze, Director of Division of Community Services,
Department of Human Services, Appellees.
 Nos. 82-1798, 82-2365, 82-2545 and 82-2423.
 United States Court of Appeals,
Eighth Circuit.
 Submitted March 17, 1983.
Decided Aug. 12, 1983.
Rehearing Denied Sept. 8, 1983.
 
 Kapsner & Kapsner, Michael J. Williams, John C. Kapsner, Bismarck, N.D., Mary Deutsch Schneider, Fargo, N.D., for appellees.
 Robert O. Wefald, Atty. Gen., State of N.D., Daniel Hovland, Allan Benson, Asst. Attys. Gen., Albert A. Wolf, Sp. Asst. Atty. Gen., Bismarck, N.D., for appellants.
 Before BRIGHT and JOHN R. GIBSON, Circuit Judges, and HANSON, Senior District Judge.*
 BRIGHT, Circuit Judge.
 
 
 1
 Allen I. Olson, the Governor of North Dakota, and twelve other North Dakota State officials (hereinafter "the State") appeal three orders of the district court[1] directing the State to take specific actions to rectify violations of the federal and state constitutional and statutory rights of residents of two North Dakota facilities for mentally retarded citizens and awarding attorneys' fees and costs. The Association of Retarded Citizens of North Dakota (ARC) cross-appeals the district court's failure to find a right to education for handicapped children aged three to five under the Education for All Handicapped Children Act, 20 U.S.C. § 1401 et seq. For the reasons outlined below, we: (1) affirm the district court on the merits; (2) modify and, as modified, affirm the district court's award of attorneys' fees and costs; and (3) remand to the district court for further proceedings as may be appropriate.
 
 We summarize our rulings as follows:
 
 2
 1) the district court did not err in refusing to abstain from the case;
 
 
 3
 2) the district court order of August 31, 1982, which requires, inter alia, the State to reduce the number of handicapped individuals in state institutions and improve the quality and delivery of services to the handicapped, does not impermissibly interfere with North Dakota's operation of its facilities and programs for the mentally handicapped;
 
 
 4
 3) the State has a duty under North Dakota law to provide appropriate treatment, services and habilitation in the least restrictive appropriate setting to both voluntarily and involuntarily committed mentally handicapped citizens;
 
 
 5
 4) should implementation of the program ordered by the district court for the reduction of residents and improvement of facilities at state institutions for the mentally handicapped prove impossible or impractical, the district court retains continuing jurisdiction to make any necessary and appropriate changes;
 
 
 6
 5) the district court did not err in interpreting federal and state law, as it existed at the time of the district court's ruling, as not requiring mandatory pre-school education for handicapped children aged three to five in North Dakota; however, the North Dakota legislature has recently enacted a statute which imposes mandatory pre-school education for handicapped children in this age group; and
 
 
 7
 6) attorneys for ARC should be awarded $455,738.13 for attorneys' fees and costs in the district court; this is a reduction from the $521,162.70 awarded by the district court, 561 F.Supp. 495.
 
 
 8
 I. Background.
 
 
 9
 ARC is a nonprofit corporation which was incorporated in North Dakota in 1957, and consists of approximately 1,200 parents and guardians of mentally retarded citizens together with mental retardation professionals, concerned citizens, and the mentally retarded citizens themselves. The ARC and six mentally retarded citizens of North Dakota brought this action seeking declaratory and injunctive relief regarding treatment and conditions in the Grafton and San Haven state facilities for the retarded, and alternatives to placement in those facilities. ARC sought relief under the First, Fourth, Fifth, Eighth, Ninth, and Fourteenth Amendments to the United States Constitution; the Rehabilitation Act of 1973, 29 U.S.C. § 794; the Education for All Handicapped Children Act of 1975, 20 U.S.C. § 1401 et seq.; 42 U.S.C. § 1983; and state law. The defendants are North Dakota public officials responsible for the care and condition of mentally retarded citizens.
 
 
 10
 ARC filed its complaint on September 26, 1980. On January 13, 1981, the district court granted class certification. The plaintiff class consists of ARC and all persons who, as of September 26, 1980, and at any time thereafter, have been or may become residents of Grafton or San Haven. The court also granted the State's first motion to stay the proceedings to allow the North Dakota Legislative Assembly the opportunity to resolve independently the issues raised. The district court subsequently lifted the stay, and on May 29, 1981, State officials made separate motions to abstain and/or dismiss the lawsuit. The district court denied the motions on August 28, 1981.
 
 
 11
 On September 8, 1981, the State filed an answer admitting numerous deficiencies in state institutions for the retarded. In an attempt to remedy some of the more critical problems at the institutions, the district court, on November 4, 1981, issued an interim order and appointed a court observer to monitor compliance with the order. The district court, on December 16, 1981, also awarded interim attorneys' fees to the ARC in the amount of $183,197.50.
 
 
 12
 The trial commenced on January 27, 1982, and continued intermittently for thirty-one days until May 14, 1982. More than fifty expert and lay witnesses testified. During the trial, ARC filed a motion for order to show cause why the State should not be held in contempt of court for noncompliance with certain provisions of the district court's interim order of November 4, 1981, and for failure to pay the attorneys' fees awarded by the December 16, 1981 order. The district court held a hearing regarding State officials' admitted noncompliance with the December 16 order and the staffing additions of the November 4 order. On May 7, 1982, the district court issued an order which refused to hold the State in contempt for failure to comply with its orders. However, the district court ordered State officials to make the staffing additions or transfer residents to other facilities. Further, the court ordered that ARC attorneys receive interest on the interim award of $183,197.50 at the rate of fourteen percent per annum, and that attorneys for ARC receive an additional allowable expense of all lawful interest paid or incurred by counsel to loaning agencies for operational loans made in an amount not exceeding the principal sum.
 
 
 13
 The trial concluded on May 14, 1982. On May 17, 1982, the State filed a motion to alter or amend the district court's order awarding fourteen percent interest on the interim award of attorneys' fees and interest on operational loans incurred by counsel. The district court denied the motion.
 
 
 14
 On August 31, 1982, the district court issued its memorandum and order on the merits, 561 F.Supp. 473. The district court found, inter alia, that: on a per person basis, in 1980, North Dakota spent fewer dollars per resident than any other state in the United States; as of June 30, 1981, the national average per diem expenditure was $77.90 per resident, compared to North Dakota's per diem of $26.42; both the San Haven and Grafton facilities were overcrowded; neither of these institutions was equipped or maintained in such a manner as to meet the State's fire and safety standards; both facilities were understaffed, with critical shortages in medical doctors, psychiatrists, psychologists, physical therapists, occupational therapists, educational specialists, nurses, practical nurses and direct care personnel; there were shortages in the administrative staff which resulted in professional personnel being required to devote an inordinate amount of time to internal administration instead of professional resident support; until the commencement of this case, no program for the administration of drugs existed at either San Haven or Grafton; drugs were administered "so casually" that drugs were delivered to the wrong residents, drugs were left unguarded among the residents, and no meaningful record of individual drug uses was kept; and the individualized habilitation plans of each resident developed by the professional staff of San Haven and Grafton do not reflect the state of the science as to either analysis of the problem or adequate remedial action.
 
 
 15
 The court directed the State to take specific actions to rectify violations of the federal and state constitutional and statutory rights of the mentally retarded residents in the certified class. Paragraphs 6 and 9 of the district court's order are especially pertinent to this appeal. They provide:
 
 
 16
 6. Defendants are permanently enjoined to seek placement in existing licensed or accredited facilities, or to create community based residential services meeting * * * standards [outlined in Accreditation Council for Services for Mentally Retarded and other Developmentally Disabled Persons, Standards for Services for Developmentally Disabled Individuals (1981) (hereinafter "ACMR/DD") ] sufficient to reduce the number of residents at the Grafton state school to not more than 450 by July 1, 1987, and to show the court reasonable progress to these ends annually. Further, the defendants are enjoined, by July 1, 1987 to present to the court a program to reduce the residents by at least an additional 200 persons before July 1, 1989.
 
 
 17
 * * *
 
 
 18
 * * *
 
 
 19
 9. Defendants are permanently enjoined to comply with all Title XIX [of the Social Security Act, 42 U.S.C. § 1396 et seq.] regulations by July 1, 1985, and to comply with all ACMR/DD standards by July 1, 1987, at all facilities where any class member is residing or will reside. Compliance includes personnel levels as well as facility standards.
 
 
 20
 Both the State and ARC filed motions to alter or amend the August 31, 1982 order. The State requested the district court to amend paragraph 9 of the order to allow the State until July 1, 1987 to comply with all Title XIX regulations at the Grafton State School. The State requested this delay to alleviate the alleged need for additional new construction of residential buildings. The State also sought to have paragraph 6 amended to allow qualified State professionals in the field of mental retardation flexibility to determine if, and when, further reductions in the population of the Grafton and San Haven facilities would be warranted following the initial depopulation of these facilities to not more than 450 residents by July 1, 1985. On October 7, 1982, the district court denied the motions to alter or amend.[2]
 
 
 21
 On September 10, 1982, ARC filed a motion for attorneys' fees and costs of $1,011,072.66. On November 19, 1982, the court awarded ARC $521,162.70 for attorneys' fees and costs. This amount includes the $183,197.50 interim award.
 
 
 22
 The State appeals three orders of the district court: (1) the May 7, 1982 order awarding ARC attorneys interest on the interim award of $183,197.50 and interest incurred by ARC attorneys on operational loans; (2) the August 31, 1982 order on the merits; and (3) the November 19, 1982 order awarding attorneys' fees and costs. ARC cross-appeals the August 31, 1982 order.
 
 
 23
 On appeal, the State contends that the district court (1) abused its discretion in denying the State's motion to abstain, (2) impermissibly interfered with North Dakota's operation and condition of its state institutions and programs for the mentally retarded, (3) erred in concluding that a constitutional right to treatment exists under the due process clause of the fourteenth amendment, (4) erred in concluding that section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides a basis for relief, (5) erred in its failure to render a decision on the State's motion to join the South Valley Education Unit at Wahpeton, North Dakota, and the Wahpeton Public School District as necessary parties, (6) abused its discretion by awarding prejudgment interest on an interim award of attorneys' fees under the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988, (7) abused its discretion by awarding prejudgment interest at a rate of fourteen percent on the interim award, and (8) abused its discretion in awarding costs and attorneys' fees to the ARC in the amount of $521,162.70 pursuant to 42 U.S.C. § 1988. In its cross-appeal, ARC asserts that the district court erred in failing to find a right to education for children aged three to five under the Education for All Handicapped Children Act, 20 U.S.C. § 1401 et seq.
 
 
 24
 II. Discussion.
 
 
 25
 A. The State's Motion to Abstain.
 
 
 26
 Prior to trial, the State petitioned the district court to abstain from exercising jurisdiction, or, in the alternative, stay any further action and maintain jurisdiction during the 1981-83 North Dakota legislative biennium. The State contends on appeal that the district court erred in denying its motion. The State urges that the district court should have abstained because the exercise of federal jurisdiction in this case disrupts the State's recent good faith efforts to improve independently the provision of services to the mentally retarded. The State has presented evidence, for example, that appropriations for the 1981-83 legislative biennium for services to the mentally retarded or developmentally disabled more than doubled over the previous biennium budget.
 
 
 27
 The decision of the district court not to abstain will be disturbed on appeal only if abuse of discretion is demonstrated. Baggett v. Bullitt, 377 U.S. 360, 375, 84 S.Ct. 1316, 1324, 12 L.Ed.2d 377 (1964). Abstention from the exercise of federal jurisdiction is the exception, not the rule. Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244, 47 L.Ed.2d 483 (1976). The Supreme Court has admonished that abstention should be used only in the extraordinary and narrow circumstances where it would clearly serve an important countervailing interest. County of Allegheny v. Frank Mashuda Co., 360 U.S. 185, 188-89, 79 S.Ct. 1060, 1062-63, 3 L.Ed.2d 1163 (1959).
 
 
 28
 The State relies on Burford v. Sun Oil Co., 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), to support its contention that the district court erred in failing to abstain. In Burford, the Sun Oil Co. challenged an order of the Texas Railroad Commission granting Burford the right to drill oil wells in an oil field subject to a comprehensive regulatory scheme which was implemented by the Railroad Commission. The district court dismissed the federal action, but the court of appeals reversed. The Supreme Court, in turn, reversed the court of appeals. Writing for the majority, Justice Black explained the Court's holding:
 
 
 29
 The State provides a unified method for the formation of policy and determination of cases by the Commission and by the state courts. The judicial review of the Commission's decisions in the state courts is expeditious and adequate. Conflicts in the interpretation of state law, dangerous to the success of state policies, are almost certain to result from the intervention of the lower federal courts. On the other hand, if the state procedure is followed from the Commission to the State Supreme Court, ultimate review of the federal question is fully preserved here. * * * Under such circumstances, a sound respect for the independence of state action requires the federal equity court to stay its hand. [319 U.S. at 333-34, 63 S.Ct. at 1107 (citation omitted).]
 
 
 30
 In reaching its decision, the Court gave substantial weight to the following factors: the Commission and the reviewing court had special expertise in the area of gas and oil regulation; the complicated geological problems which had to be taken into account to achieve an equitable production system within the field; the importance of gas and oil production to the Texas economy; the fact that Texas and other oil producing states coordinated their efforts to establish production levels; the possibility that inefficient regulation of the field would result in substantial waste of oil; and the fact that previous federal court intervention created significant friction between Texas and the federal government.
 
 
 31
 In our view, the Burford abstention doctrine is wholly inappropriate to this case. The present case does not fit within the factual or legal requirements of Burford. First, the instant case involves federal statutes and substantial federal constitutional rights, whereas Burford did not. Second, developmental disabilities is not a highly regulated area of North Dakota law, whereas gas and oil in Burford was subject to numerous state regulations. Third, no interpretation of complicated state law which would require a specialized knowledge of a peculiar subject matter is required in this case, whereas such interpretations were required in Burford. Fourth, State officials did not propose that the district court should abstain so that issues raised would be resolved by a specialized state court, whereas in Burford a complex remedial process involving specialized state courts was available. Fifth, North Dakota's economy is not inextricably intertwined with the subject matter of this case so as to affect most individuals in the state, whereas gas and oil in Texas had such an effect.
 
 
 32
 Moreover, State officials cite no Burford abstention case similar to the instant case. Accordingly, we conclude that the district court properly exercised its discretion in refusing to abstain.
 
 
 33
 As a final note on this issue, we observe that while the 1981 Legislative Assembly's actions were noteworthy, they form no basis for granting the State's motion for abstention. Cases involving questions of civil rights are the least likely candidates for abstention. Moe v. Brookings County, South Dakota, 659 F.2d 880 (8th Cir.1981).
 
 
 34
 B. The Exercise of Judicial Authority.
 
 
 35
 The State urges that the district court's order of August 31, 1982 impermissibly interferes with North Dakota's operation of its institutions and programs for the mentally retarded. The State admitted at trial that many deficiencies exist at Grafton and San Haven. The State points out, however, that the record discloses that North Dakota is developing, in good faith, a plan to correct conditions at these institutions. The State asserts that long standing principles of federalism require that North Dakota should be given the opportunity to solve federal constitutional problems independently.
 
 
 36
 The State further asserts that the Supreme Court has recognized the need for courts to exercise restraint in matters pertaining to the operation of state institutions and programs for the mentally retarded. Youngberg v. Romeo, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). As a practical matter, the State argues, state legislatures are better suited to make difficult value judgments and resolve delicate issues of social problems than federal courts.
 
 
 37
 The State makes two specific arguments in this regard. First, the State argues that paragraph 6 of the district court's order of August 31, 1982 contravenes the mandate of the Supreme Court in Youngberg. Paragraph 6 requires State officials to reduce the number of residents at the Grafton State School to not more than 450 persons by July 1, 1987, and to present to the court, by July 1, 1987, a program to reduce the residents by at least an additional 200 persons before July 1, 1989. State officials do not question the authority of the district court to order a reduction in the institutional population. See e.g., Finney v. Arkansas Board of Correction, 505 F.2d 194 (8th Cir.1974). Nor do State officials question the reasonableness of a population reduction to no more than 450 persons by July 1, 1987. Rather, the State contends that the district court requirement that by July 1, 1987, State officials present a program to reduce the number of residents by an additional 200 persons before July 1, 1989 is an unreasonable exercise of power and an abuse of judicial discretion. The State argues that as many as 300 residents of the Grafton State School would be extremely difficult to deinstitutionalize, and, therefore, the district court order is unrealistic. Accordingly, the State urges that it be afforded the flexibility to determine whether a further reduction in the institutional population is warranted after 1987, rather than have the federal court substitute its judgment for such professionals.
 
 
 38
 We note initially that the district court specified that a program should be developed to reduce the institutional population by an additional 200 persons (from 450 to 250 persons) before July 1, 1989. We conclude that this goal is reasonable and supported by the record. Professionals testified at trial that only ten to 200 persons in North Dakota require institutionalization. Professionals who testified on behalf of State officials did not differ significantly regarding the number of persons requiring institutionalization in North Dakota.
 
 
 39
 Further, the district court order only requires State officials to develop a program. This can hardly be classified as an unreasonable intrusion into professional judgment. Responsible State officials would at all times develop and retain control of the actual administration of the program. If, as the State suggests, circumstances arise which would make actual implementation of that program impossible, the district court has retained continuing jurisdiction and can make any changes necessary at that time. There is simply no reason to reject the district court's judgment where, as here, the court has retained the ability to make the necessary changes justice may require. See Maryland & Virginia Milk Producers Assoc. v. United States, 362 U.S. 458, 473, 80 S.Ct. 847, 856, 4 L.Ed.2d 880 (1960).
 
 
 40
 Second, the State urges that the paragraph 9 requirement that North Dakota meet all Title XIX standards by 1985 and ACMR/DD standards by 1987 will involve an unnecessary expenditure of limited state resources. The State contends that if it is required to have the Grafton State School in full compliance with Title XIX standards by July 1, 1985, the State will be forced to construct additional buildings for 130 residents only to have them empty out within the next few years in order to comply with paragraph 6 of the district court order. Paragraph 6, as noted above, requires the State to reduce the facility's population to 250 residents by July 1, 1989. This cost, the State contends, is unreasonable and unwarranted in light of a limited budget.
 
 
 41
 We conclude that the present case does not require this Court to engage in a cost-benefit analysis. The basic assumption made by the State, that additional construction will be necessary, has not been established. The district court effectively disposed of this assertion when, in denying the request for a stay, it found that the construction was not necessary and that other options were available. This factual finding has not been challenged by State officials on appeal. Accordingly, we reject the State's contention on this issue.
 
 
 42
 C. Right to Rehabilitation.
 
 
 43
 The State asserts initially that to the extent that a constitutional right to rehabilitation or treatment for developmentally disabled has been found to exist under the due process clause of the fourteenth amendment, it has been limited to persons involuntarily committed by the State to institutions. See Youngberg v. Romeo, supra. The State asserts that in the case before us, a significant number of the residents at Grafton and San Haven are voluntary admittees and, therefore, do not enjoy similar constitutional protection.
 
 
 44
 The Supreme Court in Youngberg v. Romeo considered, for the first time, the substantive rights of involuntarily committed mentally retarded persons under the fourteenth amendment. The court held that involuntarily committed mentally retarded citizens have constitutionally protected liberty interests under the due process clause of the fourteenth amendment to reasonably safe conditions of confinement, freedom from unreasonable bodily restraints, and such minimally adequate training as reasonably may be required by these interests.
 
 
 45
 The district court based its order, in part, on these federal constitutional precepts outlined by the Supreme Court. However, we need not address the State's contention that there are a significant number of residents at Grafton and San Haven who are voluntary admittees and that the constitutional rights outlined in Youngberg are limited to the involuntarily committed. North Dakota law disposes of this claim.
 
 
 46
 The district court based its order, in part, upon N.D.C.C. § 25-01.2-02 (Supp.1981), which grants a right to treatment to all developmentally disabled persons. North Dakota law confers on the mentally retarded a panoply of rights. Section 25-01.2-02 provides:
 
 
 47
 Appropriate treatment, services, and habilitation--Treatment in least restrictive appropriate setting. All persons with developmental disabilities have a right to appropriate treatment, services, and habilitation for those disabilities. Treatment, services, and habilitation for developmentally disabled persons shall be provided in the least restrictive appropriate setting. [N.D.C.C. § 25-01.2-02 (Supp.1981).]
 
 Section 25-01.2-01(1) provides that
 
 48
 1. "Developmental disability" means a disability which meets all of the following conditions:
 
 
 49
 a. Is attributable to a mental or physical impairment or combination of mental and physical impairments.
 
 
 50
 b. Is manifested before the person attains age twenty-two.
 
 
 51
 c. Is likely to continue indefinitely.
 
 
 52
 d. Results in substantial functional limitations to the person's ability to function normally in society. [N.D.C.C. § 25-01.2-01(1) (Supp.1981).]
 
 
 53
 Section 25-01.2-01(3) defines "least restrictive appropriate setting" as
 
 
 54
 that setting which allows the developmentally disabled person to develop and realize his fullest potential and enhances the person's ability to cope with his environment without unnecessarily curtailing fundamental personal liberties. [N.D.C.C. § 25-01.2-01(3) (Supp.1981).]
 
 
 55
 North Dakota law also provides the mentally retarded with the following rights: (1) A right to "a free and appropriate education in the least restrictive appropriate setting in accordance with chapter 15-59." N.D.C.C. § 25-01-2-13; (2) a right to "appropriate and adequate medical and dental services * * *." § 25-01.2-07; (3) a right to an "individualized habilitation plan." § 25-01.2-14; (4) a right to vote at elections, to reasonable opportunity to interact with members of the opposite sex, and to confidential handling of personal and medical records. § 25-01.2-03; (5) a right of "private, unimpeded, uncensored communication with persons of the resident's choice by mail, telephone, and visitation." § 25-01.2-04; (6) a right to "receive, possess, and use lawful personal property" and to "a secure, convenient, and reasonable amount of storage space for that property." § 25-01.2-05; (7) a right to be free from unnecessary seclusion or physical restraints. § 25-01.2-09(2) and (3).
 
 
 56
 Accordingly, because state law accords a panoply of rights to handicapped individuals and makes no distinction between the voluntarily and involuntarily committed, the State's contention that it has no duty to provide appropriate treatment, services, and habilitation to involuntarily committed individuals in the least restrictive appropriate setting is without merit.
 
 
 57
 D. Section 504 of the Rehabilitation Act of 1973.
 
 
 58
 The State urges that the district court erred in concluding that section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, provides a basis for relief. Specifically, the State argues that section 504 does not create a private cause of action, and that even if such a right exists under section 504, it is unavailable to ARC because of ARC's failure to exhaust its administrative remedies. Section 794 provides:
 
 
 59
 No otherwise qualified handicapped individual in the United States * * * shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service. [29 U.S.C. § 794 (Supp. V 1981).]
 
 
 60
 Section 794 has been referred to as a codification of the right to equal protection for the handicapped. Halderman v. Pennhurst State School & Hosp., 446 F.Supp. 1295, 1323 (E.D.Pa.1977). The district court found only that "this section reinforces the conclusion * * * that the state must give the mentally retarded equal educational opportunities." The right to equal educational opportunities is embedded in both federal and North Dakota law. 20 U.S.C. § 1401 et seq. (1976); N.D.C.C. 25-01-2-13 (Supp.1981). The district court concluded section 794 to be one of the several grounds supporting this right. Even if section 794 has been inappropriately applied by the district court, the right to equal education opportunities would still exist. Thus, we need not address the section 794 issues raised by State officials.[3]
 
 
 61
 E. The Education for all Handicapped Children Act.
 
 
 62
 The Education For All Handicapped Children Act of 1975, 20 U.S.C. § 1401 et seq. (1976) (EAHCA), provides federal funding to assist state and local agencies in educating handicapped children. The EAHCA requires all participating states to provide a free appropriate education for all handicapped children between the ages of three and twenty-one no later than September 1, 1980. North Dakota receives funding under this Act to provide for the education of handicapped children. However, the EAHCA also provides that a free appropriate public education need not be provided for children aged three to five and eighteen to twenty-one, if doing so would be inconsistent with state law or practice. 20 U.S.C. § 1412(2)(B). The district court concluded that "[s]ince in North Dakota only children aged six to twenty-one are eligible for free public education, the Act only applies here to persons in that age group." The ARC disputes this legal determination by the district court in its cross-appeal.
 
 
 63
 North Dakota has recently enacted a statute that imposes mandatory pre-school education for handicapped children ages three to five on educational districts. North Dakota House Bill No. 1648 (signed by Governor Olson, March 22, 1983, effective July 1, 1985). Because this legislation postdated the district court's decision, the district court did not err in its ruling. On remand, however, the ARC may seek a modification of the district court's decree to provide for a right to education for children aged three to five in North Dakota under the Education for All Handicapped Children Act.
 
 
 64
 F. The State's Motion to Join a Necessary Party.
 
 
 65
 The State argues that the district court erred in failing to rule on its motion to have the South Valley Education Unit at Wahpeton, North Dakota, and the Wahpeton Public School District joined as necessary parties to this action. The State, however, has made no showing on appeal that these entities are necessary parties within the meaning of rule 19(a) of the Federal Rules of Civil Procedure. Accordingly, we hold that the district court's failure to rule on the issue of joinder is not reversible error.
 
 
 66
 G. Attorneys' Fees and Costs.
 
 
 67
 On December 16, 1981, the district court awarded interim attorneys' fees to ARC of $183,197.50. Attorneys for ARC subsequently moved for an order finding the State in contempt for failure to pay the interim award. The district court refrained from holding State officials in contempt. However, the court ordered that (1) ARC attorneys receive fourteen percent interest on the interim award from the date of allowance until paid, and (2) that the State reimburse ARC attorneys for all interest payments on operational loans taken out by ARC counsel until the State paid the interim attorneys' fee award.
 
 
 68
 Following the trial, counsel for the ARC filed a motion for attorneys' fees, costs, disbursements and expenses in the amount of $1,011,072.44. This amount included a request for the same attorneys' fees previously requested and awarded in the interim order. On November 19, 1982, the district court awarded ARC $521,162.70 in overall attorneys' fees and costs. The district court calculated its award by separating the fee computation into two parts. The court designated the first part as the "preparation phase" of the litigation, and included in this designation fees earned by October 31, 1981. The court designated the second part as the "trial phase" of the litigation, and included in this designation fees earned from November 1, 1981 to September 1, 1982. The district court awarded ARC attorneys $258,392.50 for the preparation phase of the litigation. This amount included the original $183,197.50 interim award, plus an additional $75,195.00 award. The additional award resulted from an increase in the base fee of two ARC attorneys. For the trial phase of the litigation, the district court awarded ARC attorneys $198,256.25. The court also allowed $64,513.95 in costs.
 
 
 69
 The State appeals the award of attorneys' fees and costs. The State asserts that the district court abused its discretion in (1) awarding the total of $521,162.70 of costs and attorneys' fees, (2) awarding fourteen percent interest on the interim award of $183,197.50, and (3) ordering that the State reimburse ARC's attorney for all interest payments on operational loans taken out by ARC counsel.
 
 
 70
 Under 42 U.S.C. § 1988, a court should award attorneys' fees for all hours expended unless the time was unreasonably expended, duplicative, or manufactured. Hensley v. Eckerhart, --- U.S. ----, 103 S.Ct. 1933, 1939-40, 76 L.Ed.2d 40 (1983); Avalon Cinema Corp. v. Thompson, 689 F.2d 137, 139 (8th Cir.1982). As the Supreme Court recently noted in Hensley v. Eckerhart, supra,
 
 
 71
 [t]he most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.
 
 
 72
 * * *
 
 
 73
 * * *
 
 
 74
 The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94-1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. [Id. --- U.S. ----, 103 S.Ct. at 1939-40.], 76 L.Ed.2d 40.
 
 
 75
 After a careful review of the record and briefs in this case and a comparison with awards in similar cases, we conclude that the district court erred in awarding attorneys' fees and costs. We do not question the district court's award for the preparation phase of the litigation, or the $64,513.95 award for costs. However, we believe the award for the trial phase of the litigation should be reduced. The district court found that "the case should have been presented in two-thirds of the time actually used," and concluded that a multiplier fee or bonus should be denied. Nonetheless, the district court awarded ARC full compensation for the time expended. We agree with the district court that ARC's attorneys demonstrated "considerable skill" and achieved "excellent results." However, the district court's determination that the case could have been presented in less time, in conjunction with the fact that the hourly rates used by the district court to calculate the award for the trial stage of the litigation are fair in light of the customary fees charged by counsel, require us to reduce that part of the attorneys' fees award attributable to the trial stage of the litigation.
 
 
 76
 Accordingly, we reduce that attorneys' fees award for the trial stage of the litigation from $198,256.25 to $132,831.68. This modification represents a one-third reduction. As a result, ARC's total award for attorneys' fees and costs is $455,738.13. This award is comprised of the $258,392.50 award for the preparation stage of the litigation, $64,513.95 in costs, and the reduced $132,831.68 award for the trial stage.
 
 
 77
 In addition, we conclude that the district court did not err in awarding fourteen percent interest on the interim award of attorneys' fees or in requiring the State to reimburse ARC attorneys for all interest payments on loans taken out by ARC until the State paid the interim attorneys' fee award. On November 4, 1981, the district court issued an appealable order granting injunctive relief to ARC. On December 16, 1981, the district court awarded ARC attorneys' fees. The State did not comply with this valid court order. A district court may take any reasonable action to secure compliance with its orders, and only when the district court's response is so inappropriate as to amount to an abuse of discretion will the Court of Appeals intervene. Gates v. Collier, 616 F.2d 1268 (5th Cir.1980). Instead of finding the State in contempt, the district court in this case chose to increase the fee award. We cannot say the district court's action under the circumstances was unreasonable.
 
 
 78
 III. Conclusion.
 
 
 79
 We affirm the district court on the merits.[4] Additionally, we modify, and, as modified, affirm the district court's award of attorneys' fees and costs. We do not reach the cross-appeal, but remand that issue to the district court in light of a change in North Dakota law. Moreover, because the district court retains jurisdiction over this action, we remand this case to that court for further proceedings as may be appropriate.
 
 
 80
 Finally, we award ARC attorneys' fees on appeal to be assessed pursuant to 8th Cir.R. 17, as well as costs on appeal.
 
 
 
 *
 WILLIAM C. HANSON, United States Senior District Judge for the Southern District of Iowa, sitting by designation
 
 
 [1]
 The Honorable Bruce M. Van Sickle, United States District Judge for the District of North Dakota
 
 
 [2]
 On November 16, 1982, the State moved the district court to stay its order of August 31, 1982, during the pendency of the appeal. The district court denied the motion on November 26, 1982. This court denied that stay on appeal
 
 
 [3]
 We observe, however, that in United Handicapped Federation v. Andre, 558 F.2d 413, 415 (8th Cir.1977), we found that a private cause of action exists under section 794. We reaffirmed this conclusion in Miener v. Missouri, 673 F.2d 969, 973 (8th Cir.), cert. denied, --- U.S. ----, 103 S.Ct. 215, 74 L.Ed.2d 171 (1982). We have also held that section 794 suits may be appropriately maintained in advance of the exhaustion of administrative remedies. Id. at 978
 
 
 [4]
 In so doing, we observe that Judge Van Sickle handled this important litigation in an exemplary fashion. No contention has been made on appeal that the district court erred in any of its factual findings. Moreover, of the many legal issues considered by the district court, only a few reached this court on appeal