**Carolyn CLARK**

v.

**Walter COHEN, et al.**

**Civ. A. No. 84–3383.**

United States District Court,
E.D. Pennsylvania.

June 20, 1985.

685

Ilene W. Shane and Stephen F. Gold, Philadelphia, Pa., for plaintiff.

Martha Gale, Chief Asst. City Solicitor, Law Dept., Philadelphia, Pa.; John G.

Knorr, III, Office of Atty. Gen., Harrisburg, Pa., and Arthur J. Matusow, Philadelphia, Pa., for defendants.

OPINION

HUYETT, District Judge.

Presently pending before me is plaintiff's motion for equitable relief. For the reasons set forth in the following findings of fact, discussion, and conclusions of law, this motion will be granted.

I. FINDINGS OF FACT

Because the parties have entered into a very comprehensive stipulation of the facts of this tragic case, I will provide only a brief summary of the relevant facts. The following narrative together with the stipulation constitute my findings of fact.

Plaintiff is forty-four years old. She has spent her entire adult life at Laurelton Center ("Laurelton"), a state institution for the mentally retarded, after she was committed there in 1956 at the age of fifteen. At the time of her commitment, plaintiff had been taken from the custody of her family. There are suggestions in the record and among the documents from her file at Laurelton that plaintiff's family life prior to her commitment was tempestous and disruptive to her development. A petition for plaintiff's commitment pursuant to § 326 of the Mental Health Act of 1951, as amended, 50 P.S. § 1071 *et seq.*, *repealed by* Mental Health and Mental Retardation Act of 1966, 1966 Pa.Laws 96 (codified at 50 Pa.Stat.Ann. §§ 4101–4704 (Purdon 1969)), was filed on November 8, 1956 and approved by the court the next day. Plaintiff did not have a hearing in connection with her commitment nor did she receive notice of the petition.

On November 11, 1956 plaintiff was transported to Laurelton, a residential institution located in Union County, Pennsylvania which houses approximately 350 mentally retarded persons. It is at least four hours from Philadelphia. At the time of her commitment, plaintiff was a resident of Philadelphia and still has family there. She has not seen them for approximately six years.

Although plaintiff was described as "severely defective" in the commitment petition in 1956, tests administered to her soon after her admittance at Laurelton revealed that she is in the mild range of mental retardation with an IQ of roughly 60. Her IQ tests have remained fairly constant since that time. Her IQ is much higher than the vast number of Laurelton residents and plaintiff functions at a much higher level than most of her companions at Laurelton.

Soon after she was sent to Laurelton, plaintiff expressed her displeasure with being committed there against her will. She has continued to protest her detention there up to the present time. Despite these protests, plaintiff never received a hearing regarding the propriety of either her initial commitment or her continued residence at Laurelton. Her efforts, however, to obtain a hearing have been unstinting at least since 1981.

During her almost thirty years at Laurelton, the law regarding the treatment and rights of mentally ill and mentally retarded people has changed dramatically. The statute under which plaintiff was originally committed was repealed and replaced in 1966. Plaintiff's commitment was then deemed by the Commonwealth to be equivalent to one under the new statute. In 1976, a three judge panel declared § 406 of the 1966 Act—the section dealing with involuntary commitments—unconstitutional. In spite of these events and in spite of the fact that plaintiff reached maturity in 1962, plaintiff never received a hearing. It appears from the testimony of James Pelter that the Commonwealth's Department of Public Welfare ("DPW") has no formal procedure under which persons committed indefinitely are given hearings to review their commitments. An average hearing pursuant to § 406 of the 1966 Act held in Union County costs approximately $132.

In April, 1984, Elizabeth Keister, a Laurelton employee, prepared a petition requesting authority to detain plaintiff pur-

suant to § 406 of the 1966 Act. In that petition, Keister stated: "Carolyn was admitted to Laurelton Center on November 15, 1956, under section 326 of the MH/MR Act of 1951, as amended in 1954. This commitment has never been reviewed in Ms. Clark's 28 years at Laurelton Center. Ms. Clark is mildly retarded, possesses all self-care skill and basic academic skills. Ms. Clark is requesting placement in a community residential facility or a review of her commitment. The least restrictive environment for Ms. Clark would be a structured community living arrangement and day program. Due to her long institutionalization she could not live independently at this time." This petition was never filed.

Although plaintiff has remained at Laurelton since her commitment in 1956, the staff at that facility, including plaintiff's treatment team, has agreed, at least since 1976, that she should be placed in a community living arrangement ("CLA"). All of the professionals who testified at the hearing on this matter voiced this same opinion. The stipulation details the various steps that have been taken in order to convince those in power to place plaintiff in a CLA. All of these efforts were to no avail.

A CLA consists in most general terms of a small residential group composed of mentally retarded people who function at similar levels. These individuals live in a house within the community and receive intensive supervision and training in those behaviors and skills necessary to function independently within the community. A CLA is designed to allow a mentally retarded person to live in a setting which is as close to a "normal" one as possible. They are also designed to allow for more community interaction and interaction with nonretarded persons than is an isolated institution such as Laurelton. Plaintiff has continually sought placement in some form of CLA since at least 1976. She continues to want such a placement very much.

James McFall testified on behalf of plaintiff at the May 28, 1985 hearing. McFall is qualified as an expert in the field of psychology. Although he does not possess a doctoral degree in that field, he has completed all of his degree requirements except for his dissertation. In addition, he has extensive work experience in the treatment of mentally retarded persons. In his opinion, there are no contraindictions to a placement in a CLA for plaintiff. He testified that in his experience, plaintiff functions at a higher level than many of those currently placed in CLAs in Philadelphia. He described plaintiff as at "the highest functioning levels of any of my clients."

Dr. Paul Spangler also testified on behalf of plaintiff. He holds a doctoral degree in psychology and has extensive experience in the treatment of the mentally retarded. I find him to be qualified as an expert in the field of psychology. Spangler opined that plaintiff should be placed into a CLA as soon as possible. He noted that many people who function at a level below plaintiff's are already either in a structured CLA or in some other form of community residence. He stated that in 1985 it was unusual to see someone like plaintiff in a large institution like Laurelton.

Spangler also described a CLA program that has been developed by defendant County of Philadelphia.[1] This program, known as a Teaching Family Home, would allow plaintiff to share a home with a small number of other mentally retarded people and a husband and wife team of trained psychologists. This team would be augmented by one or two other staff members from time to time, thus bringing the staff to patient ratio to approximately one to one. This is a much higher ratio than is available at Laurelton. Spangler stated that in his opinion, plaintiff would spend approximately two years in such a placement, then two years at a minimal supervi-

---

1. Before the hearing was held on this matter, plaintiff reached a settlement with those defendants employed by the County of Philadelphia and the private defendants concerning her motion for preliminary relief. Under this settle- ment, the County has planned and developed a CLA placement for plaintiff which could be implemented within 120 days of the date of an order from this court if the Commonwealth provides funds.

sion CLA, and then live independently with some backup support. The costs of this program would be $56,000 per year for the Teaching Family Home, $20,000 to $25,000 per year for the minimal supervision CLA, and approximately $4,000 per year for the necessary backup support after that. By contrast, it costs the Commonwealth approximately $40,000 to $48,000 per year to maintain plaintiff at Laurelton.

Spangler and McFall also testified that the opportunities for growth and training at a CLA far exceeded those available at Laurelton. Although some aspects of these opinions were disputed by witnesses for the defendants, I find that Spangler and McFall were credible expert witnesses and I credit their opinions regarding the relative merits of life at a CLA and Laurelton. It is uncontroverted that certain aspects of CLA life simply cannot be duplicated at Laurelton. For example, because of its remote setting, the degree of community involvement at Laurelton will never be as great as that in a CLA. Neither will plaintiff be able to practice the food preparation she would be able to practice in a CLA.

Indeed, many attributes of a CLA make it far superior in every way to institutionalization for someone like plaintiff. At Laurelton, plaintiff shares a "room" with two other women. This room is actually a small part of a much larger room that has been divided into small bedroom areas with partitions that are three-quarters of the height of the ceiling. Plaintiff testified that there are no doors in her cottage at Laurelton, even on the bathroom. Plaintiff has little ability to structure her sleeping time at Laurelton. She testified that there was a "curfew" imposed with a strict eleven o'clock "lights out" policy. In addition, she testified that she would like to be able to shop for her own clothes in the community and to do her own food shopping and preparation. Mr. McFall testified that plaintiff cannot do any of these things while she remains at Laurelton. At the very least, she is unable to engage in the full range of these activities while at Laurelton.

In addition, although work activities are available at Laurelton, it is obvious that they are not of the same variety as those available to her in the community. Plaintiff stated her strong desire to work and earn money which she obviously enjoys spending. This motivation was considered a strong factor by both McFall and Spangler in their conclusions that plaintiff would make a good candidate for a CLA.

Plaintiff obviously desires to be placed in a CLA very much. Indeed, both McFall and Spangler testified that the failure to place her in such a program has made her so frustrated that her behavior has deteriorated. McFall testified that plaintiff's self-esteem has been adversely affected by her continued stay at Laurelton especially in light of the fact that many of her former friends who functioned at similar levels as she does have left for CLAs. There was additional testimony that plaintiff's behavior is in a "downward spiral" as a result of her continued frustration at remaining at Laurelton. This testimony was, however, strongly contested by staff members of Laurelton. The Superintendent of Laurelton, defendant S. Reeves Powers, testified that plaintiff's behavior has always been variable and that she frequently became more aggressive for periods of time. He stated that her behavior has not gotten consistently worse over the years. He admitted, however, that a continued stay at Laurelton would cause her emotional harm.

Kay Stewart, who is employed at Laurelton as a psychological services associate, supported Powers's view of plaintiff's behavior. Indeed, she testified that plaintiff's behavior has gotten better since 1981. I believe, however, that Stewart's testimony does not deserve much weight. She does not hold a degree in psychology per se and is not licensed in that field. She professed that she did not have deep background in the psychological literature. Moreover, I found that her testimony was often self-serving and that at times it was not forthright. For example, she relied on Exhibit C–15 which is a bar graph showing

plaintiff's "continued stay assessment" scores over time. This exhibit was admitted to show that plaintiff's scores did not decline over time. The 1985 score was, however, made on the basis of a new test and could not be compared with earlier scores. On cross-examinations, Stewart admitted that the inclusion of this score in C–15 and her reliance on it were "unfair". For these reasons, I find that Stewart's testimony should be given little weight. I do, however, believe that those with the closest ability to observe plaintiff over a long period of time have the best ability to assess any changes in her behavior. I therefore must conclude that there have not been any long term trends in her behavior as a result of her being denied a CLA.

To understand fully the circumstances which have given rise to plaintiff's present plight, it is necessary to sketch briefly the complicated relationship between local and state authority and responsibility in the provision of services to mentally retarded citizens. Both areas of government have some responsibility in this area. The responsibilities of the state include: ensuring the availability of adequate mental retardation services to all those who need them; making and enforcing regulations to implement the Mental Health/Mental Retardation Act; consulting with the various counties and assisting them in carrying out their mental retardation functions; operating state facilities, and supervising mental retardation facilities, services, and programs. The counties (and with respect to this action, Philadelphia County) have the duty to cooperate with the state to ensure that services are available.

In addition, defendant Surles, who is the Mental Health and Mental Retardation Administrator for the County of Philadelphia, is responsible for establishing an organizational unit or units consisting of multi-disciplinary professional staff capable of providing and planning appropriate services for mentally retarded persons in need of such services from the county. These organizational units are known as "Base Service Units" ("BSUs"). The County has contracted with several BSUs each of which serves individuals from a different area of the City of Philadelphia. Defendant Centralized Comprehensive Human Services, Inc. operates the John F. Kennedy Community Mental Health and Mental Retardation Center ("JFK MH/MR") which is the BSU responsible for serving plaintiff. The obligations of JFK MH/MR are described in some detail in the stipulation of facts and I will not recite them here. It is unfortunate, but true, however, that although nominally responsible for the provision of services to plaintiff, JFK MH/MR apparently has no records in its possession concerning plaintiff from the time of her commitment until 1976. Since 1976, however, plaintiff's BSU has been repeatedly advised by Laurelton staff that plaintiff should not be institutionalized and should be placed in a CLA. JFK MH/MR, in fact, attempted to have Philadelphia's mental health and mental retardation program arrange a CLA placement for plaintiff. Like all other attempts to transfer plaintiff from Laurelton, however, this never resulted in any change in plaintiff's treatment.

Although all the available professional opinion strongly favors a CLA for plaintiff, and has for the last nine years, plaintiff remains at Laurelton. The primary forces which have kept her there appear to be bureaucratic ineptitude and insufficient allocations of funds to community residence programs. Mr. Paul Hindman testified at the May 29, 1985 hearing regarding the process by which mental retardation services are funded by the state. He is currently director of the DPW's Bureau of Planning and Resource Allocation. He testified that DPW has allocated approximately $500 million for mental retardation services for the present fiscal year and that over one-half of this money goes to state institutions. Only 23% goes to community residential programs. He also testified that each year some of the money allocated to the counties for community residential programs is not spent. These "carryover funds" are then reallocated during the next fiscal year to other counties. DPW has the discretion to

reallocate this carryover, at least to some degree. In spite of the fact that plaintiff's plight has been known by those at Laurelton, JFK MH/MR, and the County for many years, Hindman testified that no money has ever been sought or proposed to fund a CLA for plaintiff. Indeed, in the DPW budget for the 1985–1986 fiscal year, there was no increase for non-Pennhurst community placements at all.[2]

## II. DISCUSSION

### A. Introduction

Plaintiff makes a number of specific contentions in support of her motion for injunctive relief. She claims that the actions of the defendants have violated § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. She also claims that she has been deprived of her liberty without due process and that she has had her substantive rights under the due process clause violated. Defendants [3] deny that plaintiff has been the victim of actionable discrimination under the Rehabilitation Act and contend that no constitutional violations have occurred. In addition, they argue that the relief plaintiff seeks is inappropriate.

At the hearing on this matter, plaintiff requested that her motion for preliminary relief be treated as one for a permanent injunction. Although in most cases I would have given all parties advance notice of my intention to accelerate a hearing on a permanent injunction, defendants did not object to plaintiff's proposal either in court or in their post-hearing supplemental memoranda. I will therefore treat plaintiff's present motion as one for a permanent injunction. *See* Fed.R.Civ.P. 65(a).

▮ The power to grant a permanent injunction rests with the sound discretion of the trial court. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1966). The court may grant a permanent injunction after a hearing if there are no material issues of fact and the issues of law have been correctly resolved. *See Standard Oil Co. of Texas v. Lopeno Gas Co.*, 240 F.2d 504 (5th Cir.1957).

Plaintiff states claims on both statutory and constitutional grounds. The federal courts have long been directed to decide whether causes of action can be supported on statutory grounds before they adjudicate constitutional law issues. *See Hagans v. Lavine*, 415 U.S. 528, 543, 94 S.Ct. 1372, 1382, 39 L.Ed.2d 577 (1974); *Siler v. Louisville & Nashville R.R. Co.*, 213 U.S. 175, 29 S.Ct. 451, 53 L.Ed. 753 (1909). I will therefore address plaintiff's Rehabilitation Act argument first.

### B. Rehabilitation Act

Plaintiff advances a claim under the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Act"). Introduced in the House of Representatives on December 9, 1971 and in the Senate on January 20, 1972, § 504 of the Act was framed initially as an amendment to the Civil Rights Act of 1964. Although it ultimately became part of another act, its language and intent were patterned after other civil rights legislation, especially Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a). Section 504 states:

> No otherwise qualified handicapped individual in the United States, as defined in section 706(7) of this title, shall, solely by reason of his handicap be excluded from participation in, be denied the benefits of, or be subjected to discrimination under

---

2. Apparently the state and counties have been struggling with providing community placements for former residents of the Pennhurst State School. Defendant Jennifer Howse wrote to defendant Richard Surles on July 20, 1984, to inform him that the state would provide funding for 27 community placements for non-Pennhurst clients. Exhibit P–13. This money was never allocated to Philadelphia, however.

3. Although, defendants employed by the County of Philadelphia and those employed by JFK MH/MR have settled for the purposes of this motion, I will not limit the term defendant in this discussion solely to the Commonwealth's employees.

any program or activity receiving federal financial assistance.

29 U.S.C. § 794.

Senator Humphrey, the primary Senate sponsor of the bill, said when introducing it:

> I introduce ... a bill ... to insure equal opportunities for the handicapped by prohibiting needless discrimination in programs receiving Federal financial assistance ... The time has come when we can no longer tolerate the invisibility of the handicapped in America ... I am calling for public attention to three-fourths of the Nation's institutionalized mentally retarded, who live in public and private residential facilities which are more than 50 years old, functionally inadequate, and designed simply to isolate these persons from society.... These people have the right to live, to work to the best of their ability—to know the dignity to which every human being is entitled. But too often we keep children, whom we regard as "different" or a "disturbing influence" out of our schools and community activities altogether ... Where is the cost-effectiveness in consigning them to ... "terminal" care in an institution? These are people who can and must be helped to help themselves. That this is their constitutional right is clearly affirmed in a number of recent decisions in various judicial jurisdictions.

118 Cong.Rec. 525 (1972).

Unfortunately, Congress apparently assumed that § 504 would be enforced as had previous civil rights legislation and provided no specific authorization for rulemaking in the statute. This situation was remedied when President Ford signed Executive Order No. 11,914 on April 28, 1976 which required the secretary of the Department of Health, Education, and Welfare (now the department of Health and Human Services) to promulgate regulations for the enforcement of § 504. It was not until 1977, however, that such regulations were published. *See Cherry v. Mathews*, 419 F.Supp. 922 (D.D.C.1976).

As the Supreme Court has recognized, these regulations are especially helpful in interpreting the congressional intent in passing § 504. This is true because the responsible congressional committees participated in their formation and both those committees and Congress as a whole endorsed the final product. *See Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 1254–55 & n. 15, 79 L.Ed.2d 568 (1984). Plaintiff relies in particular on 45 C.F.R. §§ 84.4(b)(1)(i)–(iv) which state:

> (b) Discriminatory actions prohibited.
> (1) A recipient, in providing any aid, benefit, or service, may not, directly or through contractual, licensing, or other arrangements, on the basis of handicap:
> (i) Deny a qualified handicapped person the opportunity to participate in or benefit from the aid, benefit, or service;
> (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others;
> (iii) Provide a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others;
> (iv) Provide different or separate aid, benefits, or services to handicapped persons or to any class of handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services that are as effective as those provided to others;

The term "equally effective" is defined in the regulations as:

> (2) For purposes of this part, aids, benefits and services, to be equally effective, are not required to produce the identical result or level of achievement for handicapped and nonhandicapped persons, but must afford handicapped persons equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs.

45 C.F.R. § 84.4(b)(2). These regulations emphasize that, "although separate services must be required in some instances, the

provision of unnecessarily separate or different services is discriminatory." 20 C.F.R. Part 84, Appendix A, ¶ 6.

With these general considerations in mind, I will now turn to the specifics of plaintiff's Rehabilitation Act claim.

Plaintiff alleges that the provision of services to her at Laurelton discriminates against her in violation of the act.[4] She alleges that because other similarly situated people are provided services in more integrated settings such as in CLAs, her retention at Laurelton constitutes unnecessarily separate or different treatment which the regulations declare discriminatory.

■ In order to state a claim under § 504[5], plaintiffs must prove that 1) they are handicapped within the meaning of the Act, 2) that they are "otherwise qualified" for the services sought, 3) that they were excluded from the services sought solely by reason of these handicaps, and 4) that the program in question receives federal financial assistance. *Strathie v. Depart-*

*ment of Transp.*, 716 F.2d 227, 230 (3d Cir.1983); *Doe v. New York University*, 666 F.2d 761, 774–75 (2d Cir.1981).

It is beyond dispute that plaintiff is a handicapped person within the meaning of the Act. *Doe v. Region 13 Mental Health Mental Retardation*, 704 F.2d 1402 (5th Cir.1983). I also believe that the parties do not dispute that plaintiff is "otherwise qualified" for the services she contends are being denied to her: a CLA. Indeed, given the record developed in this case, I would have no hesitancy finding plaintiff to be so qualified even if I did believe that it was disputed.

■ Defendants do contest, however, the other two requirements set forth above. Defendants argue that plaintiff has not been the victim of discrimination solely on the basis of her handicap. They also argue that she had not made the necessary showing that the "federal funding" requirement of the Act has been met.[6]

Defendants argue that the reason that plaintiff has been detained for twenty-nine

---

**4.** Plaintiff does not assert that § 504 requires deinstitutionalization as a general matter. I note that this claim has not been warmly received by the courts. *See, e.g., Kentucky Ass'n for Retarded Citizens v. Conn*, 510 F.Supp. 1233, 1243–44 (W.D.Ky.1980), *aff'd*, 674 F.2d 582 (6th Cir.), *cert. denied*, 459 U.S. 1041, 103 S.Ct. 457, 74 L.Ed.2d 609 (1982).

**5.** Although the Supreme Court has assiduously avoided this question, *see, Consolidated Rail Corp. v. Darrone*, 465 U.S. 624, 104 S.Ct. 1248, 1252 n. 7, 79 L.Ed.2d 568 (1984), I believe that it is well established that plaintiff possesses a private cause of action under § 504. *Doe v. Coluatti*, 592 F.2d 704, 708 n. 8 (3d Cir.1979).

**6.** Defendants make two preliminary arguments regarding plaintiff's claim that they have violated the Rehabilitation Act. They argue that the Act does not reach discrimination among groups of handicapped persons. The only authority cited in support of this theory is dictum from *Colin K. v. Schmidt*, 715 F.2d 1, 9 (1st Cir.1983). At least in this circuit, however, the cases have allowed claims under the Act involving assertions of discrimination between classes of handicapped persons. *See Doe v. Coluatti*, 592 F.2d 704 (3rd Cir.1979) (challenging a Pennsylvania statute which discriminated against mentally handicapped persons vis-a-vis physically handicapped persons) *see also* 45 C.F.R.

§ 84.4(b)(1)(iv) (discrimination can be found in provision of unnecessarily different or separate services "to any class of handicapped persons.").

Defendants also argue that the Rehabilitation Act does not require "affirmative actions" such as those sought by plaintiff. They rely on language to that effect in a number of Supreme Court cases construing the Act. *See, e.g., Smith v. Robinson*, ―― U.S. ――, ――, 104 S.Ct. 3457, 3472, 82 L.Ed.2d 746 (1984) (case involving reconciliation of 42 U.S.C. § 1983, § 504, and the Education of the Handicapped Act, 20 U.S.C. § 1415); *Southeastern Community College v. Davis*, 442 U.S. 397, 411, 99 S.Ct. 2361, 2369, 60 L.Ed.2d 980 (1979). This reliance is misplaced. As the Court explained in *Alexander v. Choate*, ―― U.S. ――, 105 S.Ct. 712, 721 n. 20, 83 L.Ed.2d 661 (1985) the Act requires elimination of existing obstacles to the participation of the handicapped in federally funded programs. The Act does not, however, require "'changes,' 'adjustments,' or 'modifications' to existing programs that would be 'substantial' ... or that would constitute 'fundamental alterations in the nature of a program' ... rather than ... those changes that would be reasonable accommodations."

Plaintiff's requested relief in this case does not seek the widespread institutional changes or the dramatic changes in program organization that *Alexander v. Choate* held were beyond the scope of the Act.

years at Laurelton has nothing to do with her handicap, but is merely a result of inadequate funding. They argue that funds are simply not adequate to provide CLAs for all those who could benefit from them and that the available funds are disbursed in a nondiscriminatory fashion. I do not believe that defendant's argument is correct in all of its implications. I do believe, however, that plaintiff has failed to show that she has been discriminated against solely on the basis of her handicap as required by the Act.

■ Plaintiff is mildly retarded. She lives at Laurelton with individuals of varying levels of retardation. There are also people with varying levels of retardation already placed in CLAs. I cannot explain the reason that plaintiff has not been given a CLA, and defendants could not offer any real explanation either, aside from a chronic lack of funds or bureaucratic misplacement of plaintiff over the years. Although I do not find these explanations satisfying, I cannot conclude that plaintiff has been detained at Laurelton solely because of her handicap as required by the Act.

The Act prohibits discrimination against those who are handicapped based on that handicap where the person is otherwise qualified for the receipt of the funds or the services in question. The statute makes clear, however, that this discrimination must be based "solely" on the existence of a handicap. Plaintiff is alleging that she has been the victim of discrimination vis-a-vis other handicapped people. More precisely, she alleges that other mentally retarded people receive services for which she is also qualified and that she is harmed as a result. There is no allegation, however, that plaintiff is denied a CLA because she is mildly retarded as opposed to severely or borderline retarded. If plaintiff had alleged and proved that she was denied a CLA because of her handicap and that the provision of services was operating to deny her a benefit on the basis of that handicap, she would have stated a claim under the Act. She has not, however, proved this theory.

There are painfully few cases which address this issue. In *Plummer v. Branstad*, 731 F.2d 574 (8th Cir.1984), plaintiffs challenged the state's decision to shift them from a federally funded treatment program to a state funded institutional program. The court concluded that the plaintiffs had not stated a claim under the Rehabilitation Act because they had not been excluded from services solely by reason of their handicap. The court stated "the criterion upon which the plaintiffs were excluded from Title XX funding, [the federal program] ... on its face had nothing to do with their individual abilities, backgrounds, or circumstances." *Id.* at 578. The court found that the basis of the transfer was that the plaintiffs received twenty-four hour a day treatment and care in a state run facility which provided substantially the same services as those obtained from the federally funded agency. *Id.* The court concluded that the basis of the distinction drawn between plaintiffs and those who continued to receive the federally funded services was not the plaintiffs' handicaps *per se*, but rather their residence at a facility which provided essentially the same services to them at state expense. I recognize that *Plummer* rested on a magistrate's finding that the services available to plaintiffs were substantially the same as those available to them in the federally funded program. Indeed, the court went on to state that were it not for this fact, "[s]ection 504 would prohibit a distinction based solely on ... residence, given that persons live in [institutions] only because of their handicapped status." *Id.* at 579. Although this language would seem to suggest that plaintiff in the instant case would be entitled to relief under the Act, a careful review of the facts of *Plummer* reveals that it is sufficiently different from the instant case to make this language inapposite here.

Plaintiffs in *Plummer* were persons who were institutionalized in facilities known as an intermediate care facilities ("ICFs"). These facilities were designed to provide twenty-four hour a day care for persons

who required such care for medical reasons. The state also operated other facilities that did not house those in need of constant medical care. Thus the plaintiffs in *Plummer* who all lived in ICFs were housed in those facilities *only* because of *certain aspects* of their handicaps. By contrast, plaintiff has been housed at Laurelton, not because of any particular aspect of her handicap, but simply because she is handicapped. There are people at Laurelton who are more profoundly retarded than plaintiff and who function at lower intellectual and social levels. There may be individuals there who function at a higher levels as well. Unlike the plaintiffs in *Plummer*, therefore, Laurelton residents cannot be classified solely on the basis of their handicap relative to other mentally retarded people who are in CLAs. That is, the same general mix of mentally retarded people live in CLAs as live in Laurelton. Thus, to say that plaintiff resides at Laurelton is not the same as saying that she has any particular form of handicap other than mental retardation and plaintiff only contends that she is discriminated against vis-a-vis other mentally retarded persons. *See also Vickers v. Veterans Administration*, 549 F.Supp. 85, 87, (W.D.Wash.1982) (employee of Veterans Administration could not prove that he was a victim of discrimination at work solely by reason of his handicap where he had received good job reviews in spite of his complaints regarding the adverse health effects of his work); *cf. Coates v. Illinois State Bd. of Educ.*, 559 F.2d 445, 449 (7th Cir.1977) (plaintiffs had not stated a claim under Title VI, 42 U.S.C. § 2000d, where they had only alleged that a school district had provided equal services to racially imbalanced school population).

I wish to emphasize that my decision here does not apply to a situation in which a plaintiff files suit under the Act alleging that she or he has been discriminated against vis-a-vis other handicapped persons and where that person can point to some trait related to his or her handicap as defining the class of persons discriminated against. For example, if a plaintiff alleged that he or she was kept in an institution and denied a CLA because of the level of his or her handicap and that person were otherwise qualified for the CLA, my decision in this case would not control.

I also wish to emphasize that I have not assumed that the Act reaches only to intentional discrimination. In *Alexander v. Choate*, — U.S. —, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), the Court held that not all actions under the Act required proof of intentional discrimination. In at least some circumstances, the court held that proof of disparate impact was all that was required. My decision here is not that the actions of the defendants do not violate the Act because they did not choose to keep plaintiff at Laurelton out of a conscious desire to discriminate against her on the basis of her handicap, but rather that the basis of the discrimination (whether intentional or unintentional) was not a factor related to the handicap plaintiff claims forms the basis of the discrimination.

Plaintiff relies on a number of cases to support her claim that she has been the victim of prohibited discrimination. In *Halderman v. Pennhurst State School & Hospital*, 446 F.Supp. 1295, 1323–24 (E.D. Pa.1977), *aff'd on other grounds*, 612 F.2d 84 (3d Cir.1979) (*en banc*), *rev'd*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); on *remand* 673 F.2d 647 (3d Cir. 1982) (*en banc*), *rev'd*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984) (The relevant portion of the original district opinion has not been addressed by the appellate decisions), Judge Broderick of this court held that the segregation of the handicapped in an isolated institution such as Pennhurst without minimally adequate habilitation constituted a violation of the Rehabilitation Act. He stated: "[w]e hold ... that under Section 504 unnecessarily separate and minimally inadequate services are discriminatory and unlawful." *Id.* at 1323–24. *Pennhurst*, of course, involved a broad challenge to the very existence of Pennhurst State School based on a variety of different legal theories. In their Rehabilitation Act claims, plaintiffs therein ar-

gued that the segregation of mentally retarded persons into an institution like Pennhurst was actionable discrimination under the Act.

In determining that defendants had violated the Rehabilitation Act, the *Pennhurst* court concluded that in enacting the Act, Congress had effectively codified the constitutional right to equal protection. *Id.* at 1323. Because the court had already determined that the segregation of mentally retarded persons at Pennhurst violated the equal protection clause, it concluded that the Rehabilitation Act had also been violated. *Id.* Judge Broderick's conclusion was based on *Pennsylvania Ass'n for Retarded Children v. Pennsylvania*, 343 F.Supp. 279 (E.D.Pa.1972). He held, in effect, that the equal protection clause prohibited the segregation of the mentally retarded in an isolated institution where habilitation does not measure up to minimally adequate standards. *Id.* The court did not, however, detail this theory and did not state whether the basis of its decision was a finding that the mentally retarded were a suspect class or whether education was a fundamental right. There is also no discussion of the equal protection analysis used to evaluate these claims. Although other aspects of *Pennhurst* received large amounts of appellate discussion, this particular aspect of the district court decision was not reviewed because the Third Circuit felt compelled to rest its decision on statutory rather than constitutional grounds and therefore did not reach this holding. *See* 612 F.2d at 94. Three dissenting judges of the *en banc* court did, however, reach this holding. They concluded that the state had a rational basis for the classification chosen. *See id.* at 130 (Seitz, Ch. J., Aldisert and Hunter JJ., dissenting).

Similarly, in *Association for Retarded Citizens of N.D. v. Olson*, 561 F.Supp. 473, 493 (D.N.D.1982), *aff'd on other grounds*, 713 F.2d 1384 (8th Cir.1983), the court held that the Act mandates that a state give the mentally retarded equal educational opportunity. *Id.* In *Olson,* plaintiffs challenged treatment and conditions at two state hospitals. They sought alternatives to treatment at those facilities. The court held that as between mentally retarded people and those who are not mentally retarded, the equal protection clause of the fourteenth amendment required the state to justify its discrimination against the mentally retarded by at least showing that "disparities in educational opportunity which exist between the mentally retarded and other citizens substantially furthers important state interests." *Id.* at 490.[7] The court also concluded that plaintiffs claims of discrimination among classes of mentally retarded people (those in institutions and those who live in community placements) were best evaluated under a rational basis test. *Id.* The court's holding under the Act was expressly predicated upon a conclusion that the Act and the equal protection clause were essentially the same in terms of prohibiting certain forms of discrimination against the handicapped. Assuming that the court's analysis of the plaintiffs' equal protection claims was correct, I believe that its conclusion that the rational basis test applies to claims of discrimination between classes of mentally retarded people effectively means that it would have had to find virtually all such discrimination permissable. I have read the *Olson* decision carefully and find no holding therein which suggests that the court invalidated, or meant to enjoin, any discrimination between those in institutions and those in community placements.

Finally, plaintiff relies on *Garrity v. Gallen*, 522 F.Supp. 171, 205-18 (D.N.H. 1981) a case similar to *Pennhurst* in which plaintiff challenged the conditions at a state school for the mentally retarded. The court rejected the conclusion reached by Judge Broderick in *Pennhurst* and concluded that the Act does not provide a broad mandate for deinstitutionalization *per se.* *Id.* at 213. The court did, how-

---

**7.** The decision that mentally retarded persons are a suspect class deserving of at least intermediate scrutiny appears to be inconsistent with the present law of this circuit. *See Doe v. Coluatti,* 592 F.2d 704, 710-11 (3rd Cir.1979).

ever, conclude that the defendants had violated the Act in a number of ways. For example, the court held that the defendants' decision to deny to some residents an individualized service plan was discriminatory. These plans were only developed for some of the residents of the institution and the distinction drawn was based on residence in certain of the buildings at the institution. Some of the buildings at the institution housed disproportionate numbers of severely and profoundly retarded persons. *Id.* at 184. Thus the decision to deny services to residents of these buildings was, in effect, a decision to deny services to disproportionate numbers of severely and profoundly retarded persons. The court also held that it was a violation of the Act for the administrators of the institution to make decisions regarding the suitability of treatment based on general assessments of classes of institutionalized mentally retarded persons. In other words, it was impermissible to deny treatment to severely or profoundly retarded persons based on a general conclusion that persons functioning at that level could not benefit from the treatment. Rather, the court concluded that the Act required individual assessments of the residents. *Id.* at 214–218.

Each of these three cases is distinguishable from the present one on a number of grounds. *Pennhurst* and *Olson* both involved claims that the plaintiffs therein were discriminated against vis-a-vis other nonhandicapped people. Moreover, both rest on 1) the assumption that the Rehabilitation Act was meant to codify the equal

protection clause, and 2) the conclusion that plaintiffs' rights under that clause had been violated. Moreover *Olson* does not expressly state that the discrimination between classes of handicapped persons at issue there violated the equal protection clause or the Act. Similarly, *Garrity* involved distinctions between classes of handicapped persons based on the severity of their handicaps.

I have already concluded that plaintiff has not been discriminated against solely by reason of her handicap. I believe that this conclusion renders *Garrity* inapposite. The fact that *Pennhurst* and *Olson* involve claims of discrimination between handicapped persons and non-handicapped persons renders those decisions equally inapposite. Furthermore, although I do not reach this question, I question the correctness of the equal protection analysis employed in those cases which forms the basis of the Rehabilitation Act holdings in both.

For the foregoing reasons, I must reject plaintiff's claim under the Rehabilitation Act of 1973.[8]

## C. Constitutional Claims

Plaintiff contends that the defendants' treatment of her over the years has deprived her of her constitutional rights in a number of ways. She contends that her initial commitment deprived her of liberty without due process; that the failure to hold any hearing over the course of her twenty-nine years at Laurelton constituted a similar deprivation without due process; that her substantive due process rights have been violated, and that she has been

---

**8.** Because I have determined that plaintiff has failed to show that she has been the victim of discrimination based "solely on her handicap," I need not reach defendant's second argument that she has failed to prove that the program she is alleging is discriminatory is a recipient of federal funds as required by the Act. Defendants rely on *Grove City College v. Bell,* 465 U.S. 555, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984). In that case brought under Title IX, the Court held that receipt of federal student aid by some college students did not trigger institution-wide coverage under Title IX. Rather, the Court concluded that only the college's financial aid programs were covered by virtue of the limited

nature of federal aid received. During the hearing on this matter, plaintiff demonstrated that the Commonwealth receives federal funds for mental retardation services and for community residential programs in general. Although plaintiff did not prove that the specific CLA program she desires is federally funded, I do not think that such specific proof of federal funding is necessary even under *Grove City College.* I note that at least two bills are presently pending before the Subcommittee on Education of the Senate Labor and Human Resources Committee which seek to "clarify" the meaning of Title IX in light of *Grove City College. See* S. 272 & S. 431, 99th Cong. 1st Sess. (1985).

denied access to the courts through the failure of the defendants to respond to her repeated requests for a hearing or for legal assistance. This case presents many difficult legal issues and I have considered plaintiff's constitutional claims with great care. I have concluded that plaintiff is entitled to the relief she seeks in order to remedy the present, on-going actions taken by defendants in derogation of plaintiff's rights. Plaintiff's claims can be grouped into three areas: procedural due process, substantive due process, and denial of access to the courts.[9]

### 1. Procedural Due Process

"There can be no doubt that involuntary commitment to a mental hospital, like involuntary confinement of an individual for any reason, is a deprivation of liberty which the state cannot accomplish without due process of law." *O'Connor v. Donaldson*, 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (Burger, C.J., concurring). Plaintiff alleges that her initial commitment as a minor was accomplished without sufficient protections and that she was denied due process as a result.

The starting point for an analysis of this claim is *Parham v. J.R.*, 442 U.S. 584, 99 S.Ct. 2493, 61 L.Ed.2d 101 (1979) a case in which the Supreme Court examined the process required by the constitution in the commitment of a minor. In *Parham*, the plaintiffs were minors who were committed by their parents or by the state as their legal guardian. They challenged the procedures under which they were committed as well as several substantive aspects of the state's treatment of voluntarily committed minors. The district court held that the state's procedures were defective in that they did not require that commitment take place only after notice and hearing. The Supreme Court reversed.

The Court found that a child, like an adult, has a substantial liberty interest in not being confined against his or her will

for treatment in a mental hospital. *Id.* at 600, 99 S.Ct. at 2503. (Citing *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 1809, 60 L.Ed.2d 323 (1979); *In Re Gault*, 387 U.S. 1, 12–13, 87 S.Ct. 1428, 1435–36, 18 L.Ed.2d 527 (1967); *Specht v. Patterson*, 386 U.S. 605, 87 S.Ct. 1209, 18 L.Ed.2d 326 (1967)). The Court assumed that this interest stemmed from both the child's interest in being free from bodily restraint and from the child's interest in not being stigmatized by the label attached to one who has been committed. The court found, however, that parents retain "a substantial, if not dominant" role in decisionmaking for their children and that it could be assumed that they act in the best interests of their children. *Id.*, 442 U.S. at 604, 99 S.Ct. at 2505.

▪ The Court concluded that although parents "retain plenary authority to seek, [commitment] for their children," *id.*, the risk of error inherent in this parental decision required "that some kind of inquiry should be made by a 'neutral factfinder' to determine whether the statutory requirements for [commitment] are satisfied." *Id.* at 606, 99 S.Ct. at 2506. The court went on to hold that this factfinder need not be trained in the law and that the "factfinding" need not be a formal or "quasi-formal" hearing. Due process, the Court concluded, is not violated by reliance on formal medical investigative techniques. *Id.* at 607, 99 S.Ct. at 2507. Thus, commitment of a child by his or her parents or guardians comports with due process if there is some form of inquiry into the underlying facts of the case, conducted by a neutral factfinder who may or may not be a judicial officer. A medically trained specialist in the field of mental health will suffice.

Plaintiff alleges that she has been denied liberty without due process. She alleges that her initial commitment was defective because it failed to provide her with any notice or hearing prior to the commitment. It appears from the stipulated facts of this

---

**9.** Because of my decision concerning plaintiff's due process claims, I need not reach her claims

of denial of access to the courts.

case that plaintiff was ordered to be committed to Laurelton on November 9, 1956 on the basis of a petition filed the day before by the Deputy Commissioner of Public Welfare for the City of Philadelphia. This petition was based on the certification of Dr. Donald Davidson, who examined plaintiff on June 22, 1956 and found her to have a "mental defect-severe." Plaintiff Exhibit 1. Two days after the commitment order was signed, plaintiff was sent to Laurelton. At the time of her commitment, plaintiff was a resident of the Youth Study Center, a juvenile detention center in Philadelphia.

Based on the record developed at the hearing on May 28, 1985 and May 29, 1985, I cannot say that the requirements of *Parham* have not been met. The record as it stands now simply does not contain enough information concerning the circumstances surrounding plaintiff's initial commitment to Laurelton. For example, although she was a resident of the Youth Study Center at the time of her commitment, there is no solid evidence in the documentary material produced by the parties concerning her legal status at that time. In addition, there is no real evidence concerning the nature of the inquiry made into plaintiff's condition before she was committed. Because the record at this point is deficient in these crucial areas, I cannot determine whether the minimal due process required under *Parham* was provided at plaintiff's initial commitment.[10]

After her initial commitment, plaintiff was taken to Laurelton where she has remained to this day. During the twenty-nine years since her commitment, a number of events have occurred which plaintiff claims should have triggered a review of her commitment. These events include: her reaching maturity in 1962; the repeal of the Mental Health Act of 1951 under which plaintiff was committed in 1966, and a court decision which held certain relevant aspects of the Mental Health Retardation Act of 1966 ("1966 Act") unconstitutional in 1976. I will now examine these claims.

■ Plaintiff reached the age of twenty-one in 1962, six years after she was sent to Laurelton. She argues that the defendants were under an obligation to review her commitment at that time. Although she cites no explicit authority for this argument, I agree with her conclusion.

Plaintiff was committed without notice or hearing. This lack of the usual accoutrements of due process may not be a constitutional violation in the context of the commitment of a minor by a parent or guardian; that is the teaching of *Parham*. There can be no question, however, that an adult cannot be involuntarily committed without substantially more of the guarantees traditionally associated with the concept of due process.

Although I will not discuss them at length, the courts have long considered the commitment of an adult such a massive curtailment of liberty as to require a wide range of procedural protections. For example in *Commonwealth ex rel. Finken v. Roop*, 234 Pa.Super. 155, 339 A.2d 764 (1975), the court held that civil commitment under § 406 of the 1966 Act requires at the minimum: notice, a hearing, the exclusion of hearsay evidence at that hearing, and evidence sufficient to prove the state's case by "clear, unequivocal, and convincing" evidence. *See also Dixon v. Attorney Gen'l of Pennsylvania*, 325 F.Supp. 966 (M.D.Pa. 1971) (declaring § 404 of the 1966 Act unconstitutional on its face; relief ordered included a broad range of procedural protections). The full scope of these decisions is not really relevant to the present case, however, because plaintiff has never been accorded *any* significant review of her commitment at any time.

---

**10.** Plaintiff argues that *Parham* is inapplicable because it does not apply to commitment made without parental consent. *Parham* does, however, apply to commitments made at request of the state acting as ward. *See* 442 U.S. at 617–24, 99 S.Ct. at 2511–13. The Court concluded that the differences between the roles of parents and the state acting as guardian were not sufficient to require a change in the required procedures.

■ Defendants argue, however, that they have done all that due process requires in terms of periodic review. They contend that *Parham* requires only a medical review by a neutral factfinder and that plaintiff has had such reviews in the past and continues to have them. This argument is unpersuasive.

*Parham* dealt only with the commitment of minors by their parents or legal guardians. The Court's decision rested very heavily on the assumptions that both parents and guardians act in the best interests of the child and that both have traditional authority over the raising of minors in their care. This aspect of *Parham* makes it inapposite to a situation involving someone who is not a minor. Once someone becomes an adult, one's parents lose that degree of authority found so crucial in *Parham*. Moreover, as even the *Parham* Court found, there is a possibility (born out by this case) that a "ward" of the state who is committed may become "lost in the shuffle." 442 U.S. at 619, 99 S.Ct. at 2512–13. This possibility lead the court to conclude that there might be a basis for requiring that the review of such persons be subjected to more stringent requirements then review of those committed by their parents.

The Commonwealth's argument in this area is far too broad. It argues, essentially, that if someone is committed by a parent or guardian after the minimal due process required by *Parham*, there need never be anything more than periodic medical reassessment of the committed person. This argument certainly sweeps too broadly.[11]

Plaintiff also argues that the state was obligated to review her commitment in 1966 when the 1951 Act was repealed and replaced by the 1966 Act. With that event,

the only legal basis for commitments such as plaintiff's became § 406 of the 1966 Act, 50 P.S. § 4406. Indeed, the defendants treated plaintiff's commitment as equivalent to one under § 406. Stipulation ¶ 70. The differences between § 326 of the 1951 Act under which plaintiff was committed and § 406 of the 1966 Act were, however, largely procedural. The standards for commitment were left relatively unchanged. Plaintiff never received a hearing under the 1966 Act. Indeed the parties have stipulated that there is no procedure in force under which persons with indefinite commitments are periodically reviewed, although James Pelter testified that those who are not committed for an indefinite period are reviewed.

Plaintiff argues that a review is mandated when there is some change in the legal basis or circumstances underlying the commitments. In *Jackson v. Indiana,* 406 U.S. 715, 92 S.Ct. 1845, 32 L.Ed.2d 435 (1972), the Supreme Court invalidated a state statute which allowed for indefinite commitment of a criminal defendant solely because he was incompetent to stand trial. The court found that this indefinite commitment violated due process. The court held that such a person could not be held "more than the reasonable period of time necessary to determine whether there is a substantial probability that he will attain" the capacity to stand trial in the future. *Id.* at 738, 92 S.Ct. at 1858. The Court stated:, "[a]t the least, due process requires that the nature and duration of commitment bear some relation to the purpose for which the individual is committed." *Id.* See also *McNeil v. Director,* 407 U.S. 245, 92 S.Ct. 2083, 32 L.Ed.2d 719 (1972).

Similarly, in *O'Connor v. Donaldson,* 422 U.S. 563, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975), the Court held that the state cannot

---

11. A comparison with *Vitek v. Jones,* 445 U.S. 480, 100 S.Ct. 1254, 63 L.Ed.2d 552 (1980) reveals the overbreadth of this argument. In *Vitek,* the Supreme Court held that a prisoner serving sentence had sufficient residual liberty interests to require a full panoply of due process procedures before he or she could be transferred involuntarily to a mental hospital. In

*Youngberg v. Romeo,* 457 U.S. 307, 315–16, 102 S.Ct. 2452, 2457–58, 73 L.Ed.2d 28 (1982), the Court implied that the rights of an institutionalized person should be at least as great as those of a convicted prisoner serving sentence. The institutionalized mentally retarded must have at least as great an interest in their liberty as a prisoner serving sentence.

hold, without more, a nondangerous individual who poses no danger to himself or to the community based simply on a determination that the person is mentally ill. In reaching this holding, the court stated:

The fact that state law may have authorized confinement of the harmless mentally ill does not itself establish a constitutionally adequate purpose for that confinement.... [n]or is it enough that Donaldson's original commitment was founded upon a constitutionally adequate basis, if in fact it was, because even if his involuntary confinement was initially permissible; it could not constitutionally continue after that basis no longer existed. 75.

*Id.* at 574–75, 95 S.Ct. at 2493 (citations omitted).

Plaintiff has cited no compelling caselaw in support of her argument that is more directly on point. The Commonwealth defendants in their brief opposing plaintiff's motion for preliminary relief, however, admit that plaintiff is entitled to periodic review of her commitment. Commonwealth's brief in opposition to plaintiff's motion for preliminary relief at 12. They dispute only the nature of the review. Once again, they argue that only the limited due process required under *Parham* is required.

Although the Supreme Court has repeatedly emphasized that due process is a flexible concept which varies according to the particular nature of the interest at stake and the facts of the particular case, this truism is not a sufficient basis for a conclusion that the minimal requirements of *Parham* should apply to this situation. I do not believe that *Parham* should be extended beyond the setting in which it arose: the voluntary commitment of minors at the request of a parent or guardian. I have already concluded *Parham* should not be applied to a commitment of an adult. I see no reason to change that view simply because the event triggering the review is the repeal of the legal authority under which a person is committed.

■ Moreover, although plaintiff has received some form of medical or psychological review periodically, the results of these reviews have been a nullity. Since at least 1976, these reviews have consistently recommended that plaintiff be removed from Laurelton and placed in a CLA. Defendants point to this as sufficient under their interpretation of the due process clause. In reality these "professional reviews" have been a meaningless exercise. Although transfer has been consistently recommended, it has never taken place. It has never taken place because the various entities responsible for plaintiff, who act in defendants' view as her parents, have never been able to agree on how to fund plaintiff's CLA. I cannot see how due process is served when all that takes place are periodic professional reviews whose recommendations are then ignored.

Plaintiff also alleges that she was entitled to review in 1976 when a three judge panel in the Middle District of Pennsylvania struck down § 406 of the 1966 Act. That section, of course, formed the only legal basis for the detention of plaintiff. In *Goldy v. Beal*, 429 F.Supp. 640 (M.D.Pa. 1976), the court held that the standard for commitment found in § 406 was unconstitutionally vague and stayed the further application of § 406. It later modified this stay to permit the commitment of persons under § 406, but required that those to be committed be evaluated under a rigorous standard that cured the deficiencies in the original section. This standard, which was later incorporated into DPW regulations stated:

"the Secretary of DPW and his agents and assigns, those under his direction, and all institution directors shall not receive ... [persons pursuant to section 406 of the MH/MR Act of 1966] except upon judicial determination that the following standard is met:

"(1) the person is impaired in adaptive behavior to a significant degree and is functioning at an intellectual level two standard deviation measurements below the norm as determined by acceptable psychological testing techniques.

"(2) the impairment and the resultant disability were manifested before the person' 18th birthday and are likely to continue for indefinite period; and

"(3) the person, because of his retardation presents a substantial risk of physical injury to himself or physical debilitation as demonstrated by behavior within 30 days of the petition which shows that he is unable to provide for, and is not providing for his most basic need for nourishment, personal and medical care, shelter, self-protection and safety and that provision for such needs is not available and cannot be developed or provided in his own home or in his own community without residential placement."

Plaintiff argues that *Goldy* destroyed the only legal basis for her commitment and that the defendants were obliged to review her commitment pursuant to the new standard. Defendants contend, however, that *Goldy* did not establish any obligation on their part to undertake a review of her commitment.

■ *Goldy* struck down the only legal authority under which plaintiff could have been deemed to have been committed. Although the *Goldy* court recognized that its decision did not require release of those previously committed under § 406, it must mean at a minimum that those who have been committed under that section were entitled to have their commitment reviewed under the new, constitutional standard. Defendants cling to a passage in *Goldy* which in their view means that *Goldy* imposed no affirmative obligation upon them: "[plaintiffs] merely seek a declaration that the statute under which they were committed is unconstitutional and an injunction enjoining defendants from enforcing and executing the statute in its present version; if this court rules in their favor, they will then seek release in state court." *Id.* at 645. This language cannot be read as broadly as suggested by defendant. First, it was taken from the court's discussion of

defendants' argument there that plaintiff's appropriate action in *Goldy* should have been a petition for a writ of habeas corpus action rather than a suit for declaratory and injunctive relief. Second, although plaintiff might have been a member of the plaintiff class in *Goldy*, she was committed at that time to the care of defendants. A mildly retarded person who lives in a state institution can hardly be expected to know about the decision in *Goldy*. Finally, plaintiff did, in fact, request a review of her commitment and has continued to do so since at least 1981. No hearing was ever arranged and her requests for legal assistance went unanswered. Indeed, the parties have stipulated that plaintiff requested judicial review of her commitment even before *Goldy*. Stipulation ¶ 74.

It is somewhat disingenous and ironic for defendants to argue, in essence, that plaintiff should have arranged her own hearing and at the same time to place such great reliance on *Parham*, a case which rests on the assumption that the state as guardian acts in the best interests of its wards.[12]

For the foregoing reasons, I conclude that plaintiff's rights to procedural due process have been violated by defendants' failure to provide her with any notice or hearing whatsoever during the course of her confinement in spite of the many changes both in the law and in facts of plaintiff's case which mandated that such hearings be held.

### 2. Substantive Due Process

Although the courts have been slow to recognize them, institutionalized persons have a number of substantive rights which are protected under the due process clause of the United States Constitution. Plaintiff argues that her substantive due process rights have been violated in a number of ways. First she alleges that *Goldy* creates the substantive right not to be institutionalized unless the standards set out by the *Goldy* court have been met. Second, plain-

---

**12.** Defendants contend in connection with all of plaintiff's claims that she was entitled to periodic review, that the review need only satisfy the minimal standards of *Parham*. As I have previously stated, I consider this argument to be without merit, *see supra* at p. 699.

tiff argues that state caselaw construing the Pennsylvania statutes and regulations in this area also creates a substantive right to deinstitutionalization. Finally, although plaintiff has not argued this matter, I believe that this case implicates substantive due process rights identified in *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

Plaintiff argues in conjunction with her procedural due process arguments that *Goldy* mandated not only that she be given a hearing in 1976, but that she be transferred to a CLA. Plaintiff argues that the *Goldy* standard for commitment recognizes a right not be institutionalized unnecessarily if a community placement could be developed. Plaintiff alleges that a CLA could be developed for her and that she has therefore been committed to Laurelton improperly. There is no disagreement that there has never been a judicial determination that plaintiff meets these standards. One of the defendants' witnesses, Kay Stewart, testified that, in her opinion, plaintiff did meet the standards. She did not elaborate on the basis of this opinion and on cross examination it became apparent that Stewart did not have a full working familiarity with the complete *Goldy* standard. Neither did she have a familiarity with CLAs in Philadelphia. She did state, however, that plaintiff could live in one if one were provided or available.

Defendants argue that in any event, plaintiff meets the standards for institutional commitment contained in the modified *Goldy* stay. They argue that "provisions, [for plaintiff's needs] are not available and cannot be developed without residential placement." Defendants argue that this language allows institutional placement whenever there are insufficient funds or resources available to provide for non-residential services. This interpretation would effectively allow defendants to render the *Goldy* standard meaningless. The defendants could simply refuse to allocate funds for any community placements and institutionalize all mentally retarded persons if I were to accept the proffered reading of *Goldy.* I decline to do so.

Rejection of defendant's argument is not equivalent to saying that there is a "right" to a CLA. The *Goldy* court struck down § 406 because the standard it contained which governed commitment of the mentally retarded was too vague to pass constitutional muster. This decision, by its nature, rests on the substantive conclusion that commitment was unconstitutional unless the person to be committed met certain basic requirements.

The Supreme Court has also held that the fact that a person is mentally retarded is, standing alone, not enough to warrant commitment: "[a] finding of 'mental illness' alone cannot justify a State's locking a person up against his will and keeping him indefinitely in simple custodial confinement. Assuming that the term can be given a reasonably precise content and that the 'mentally ill' can be identified with reasonable accuracy, there is still no constitutional basis for confining such persons involuntarily if they are dangerous to no one and live safely in freedom." *O'Connor v. Donaldson,* 422 U.S. 563, 575, 95 S.Ct. 2486, 2493, 45 L.Ed.2d 396 (1975). The *Goldy* standard articulates this same concern.

■ Although I recognize that only a thin line separates saying that plaintiff has a right not to be placed in an institutional setting if it is possible to create a CLA for her, and saying that she has a right to a CLA, it is meaningful line. Whatever the merits to defendants' argument that plaintiff has no right to a CLA, *Goldy* requires that she not be placed in an institutional setting unless a community placement cannot be developed. This standard is rooted in substantive due process. Defendants have, moreover, acceded to this requirement when they incorporated it into their regulations. Whatever its origins, it is now a legal requirement for commitment. Moreover, I believe that the reading given to this language by defendants distorts its plain meaning.

■ The standard states that a person cannot be committed to residential place-

ment if provision for his or her needs is not "available and cannot be developed or provided" in the community. There is no facial requirement that funding for such community placement be available or developed. Defendant would read this requirement into the words "cannot be developed or provided." It is more correct, however, to read those words in light of the other requirements set forth by the *Goldy* court. These requirements pertain to the innate abilities and characteristics of the person to be evaluated, not to the resources of DPW. Read in this light the words "cannot be developed or provided" mean that the characteristics and needs of the person under evaluation are such that no community placement would be able to provide for them. For example, a person might be so severely handicapped both physically and mentally that no community residence could be developed which would meet his or her needs. It is beyond dispute that no such innate characteristic of plaintiff prevents her from living in a CLA.

Plaintiff also argues that a number of decisions of the Pennsylvania state courts create a substantive right to deinstitutionalization. *See In Re Schmidt,* 494 Pa. 86, 429 A.2d 631, 635–66 (1981); *In Re Sauers,* 68 Pa.Commw. 83, 447 A.2d 1132, 1135–36 (Pa.Commw.Ct.1982) (en banc). Both of these cases construe Pennsylvania state statutes and regulations promulgated pursuant to them. Plaintiff seems to argue that these constructions give rise to the creation of a substantive right under the due process clause. She does not argue, by contrast, that these cases create a state liberty interest which cannot be taken without procedural due process. *See Perry v. Sindermann,* 408 U.S. 593, 599, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972). Defendants have not responded to this novel argument. Because the rights that plaintiff claims arise from these cases are essentially coterminous with those which arise under *Goldy,* I need not reach the merits of this novel argument.

Finally, I believe that defendants' treatment of plaintiff violates interests adumbrated in *Youngberg.* That case was an individual action in which the plaintiff, who was a profoundly retarded resident of the Pennhurst State School, alleged injury due to his own behavior, attack by others, and excessive physical restraint by the staff. He argued that his protected liberty interests in safety, freedom of movement, and training within the institution had been violated. The Court had little difficulty in deciding that plaintiff had cognizable liberty interests and valid claims to safe conditions and freedom from bodily restraints. 457 U.S. at 315–16, 102 S.Ct. at 2457–58.

The Court had more difficulty in evaluating plaintiff's claims for "minimally adequate training." After canvassing the available precedent the Court held that plaintiff's liberty interests required the state to provide minimally adequate or reasonable training to ensure safety and freedom from undue restraint.

In determining what treatment may be required in a given case, the Court mandated that analysis should start with the generalization that there is a right to minimally adequate training. "The basic requirement of adequacy, in terms more familiar to the courts, may be stated as that training which is reasonable in light of identifiable liberty interests and the circumstances of the case." *Id.* at 319 n. 25, 102 S.Ct. at 2460 n. 25.

In assessing the reasonability of training, the court "must show deference to the judgment exercised by a qualified professional." *Id.* at 322, 102 S.Ct. at 2461. The majority elaborated:

[t]he [training] decision, if made by a professional, is presumptively valid; liability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standard as to demonstrate that the person responsible actually did not base the decision on such a judgment.

*Id.* at 323, 102 S.Ct. at 2462. "The question suggested by *Youngberg,* then, is not what treatment was actually provided, but whether the treatment decision was profes-

sionally made and falls within the scope of professional acceptability." *Woe v. Cuomo,* 729 F.2d 96, 105 (2d Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 339, 83 L.Ed.2d 274 (1985).

Although the definition of "professional" is by its nature somewhat broad, the Court did offer some guidance:

> By "professional" decisionmaker, we mean a person competent, whether by training or experience, to make that particular decision at issue. Long-term treatment decisions normally should be made by persons with degrees in medicine or nursing or with appropriate training in areas such as psychology, physical therapy, or the care and training of the retarded.

*Youngberg,* 457 U.S. at 323 n. 30, 102 S.Ct. at 2462 n. 30. The Supreme Court's discussion of the deference to be paid to such professional judgment makes it clear that the decision has to be one based on medical or psychological criteria and not on exigency, administrative convenience, or other non-medical criteria.[13]

■ In the present case, plaintiff has been retained at Laurelton since at least 1976 in the face of unanimous professional opinion that should be transferred to a CLA. The parties have stipulated to this fact. There is also no doubt in my mind that a CLA constitutes a far less restrictive environment than does Laurelton. Although such a restrictive environment may be professionally indicated in some cases, it

has not been in plaintiff's case since at least 1976. Indeed, both the staff at Laurelton and at her BSU considered her transfer to a CLA to be an "emergency" matter by 1984. Stipulation ¶¶ 132, 135, 136.

In spite of these continual professional assessments and recommendations, plaintiff remained at Laurelton, presumably because some agency at either the state or county level did not see fit to allocate or request sufficient funds to secure a CLA for her.

The record in this case speaks for itself. Plaintiff has herself requested transfer to a CLA. This request was mirrored by the recommendations of all those professionals concerned with her well-being and continued growth as a person. All of these recommendations were ignored. As a result, plaintiff remains in an institution which cannot meet all of her needs and which restrains her both physically and emotionally more than is necessary in the eyes of those professionals familiar with her case.

In *Youngberg,* the Supreme Court determined that an institutionalized mentally retarded person's rights were not violated if she or he was given minimally adequate training and if the conditions of confinement were no more restrictive than that considered necessary by the relevant professionals. In the instant case there is no question concerning whether I should defer to the treatment opinions expressed by plaintiff's treating professionals. There is no dispute concerning the proper treatment

---

**13.** I do not believe that the *Youngberg* court meant to include decisions motivated out of budgetary constraints in the category of "professional judgments." In the majority opinion, however, the Court explicitly recognizes that budgetary constraints which prevent the implementation of professional treatment recommendations may provide the factual predicate for a defense of good-faith immunity. *See* 457 U.S. at 323, 102 S.Ct. at 2462. This statement does not mean, however, that such considerations should provide a bar to prospective equitable relief. In *Scott v. Plante,* 691 F.2d 634, (3d Cir.1983), the Third Circuit noted that different concerns inform the shaping of equitable and legal relief:

> [W]e note that *Youngberg v. Romeo* involved only a claim for money damages for past infringements of the right to treatment which

is a component of fourteenth amendment personal liberty. The Court's decision does not inform at all as to the appropriate reach of injunctive relief for the protection of liberty interests established by state law, and the holding is not necessarily dispositive of the scope of prospective relief for the protection of the fourteenth amendment liberty interests which it recognized. Obviously the problem of hindsight interference with decisions made by hard-pressed professional staff members of state mental institutions is a more serious one than that of assisting them in directing prospective injunctive relief against appropriate state officials. *See Edelman v. Jordan,* 415 U.S. 651, 667, 94 S.Ct. 1347, 1357, 39 L.Ed.2d 662 (1974).

691 F.2d at 637.

plaintiff should receive. This treatment has been denied to plaintiff over the years for reasons unrelated to the treatment of her condition. I therefore conclude that *Youngberg* commands a decision that plaintiff's substantive rights have been violated.[11]

This conclusion is strengthened by the Third Circuit's treatment of a similar issue in *Scott v. Plante*, 691 F.2d 634, 638 (3d Cir.1982) after the Supreme Court remanded it in light of *Youngberg*. *Scott* was a complicated case in which the plaintiff claimed that his constitutional rights were violated when he was confined in the Trenton State Psychiatric Hospital following a determination that he was incompetent to stand trial. Before *Youngberg* was decided the Third Circuit had reversed and remanded the judgment entered in the district court in favor of defendants on plaintiff's claims for prospective relief. The court directed that plaintiff's claims to adequate treatment and to be assigned to a less restrictive setting were to be reassessed on remand in the district court. The defendants petitioned for certiorari, however, and the Supreme Court remanded the case to the Third Circuit for further consideration in light of *Youngberg*.

On remand, the Third Circuit reexamined all of plaintiff's claims to determine the effect of *Youngberg*. In addressing plaintiff's right to be free from unreasonable restraint the court stated:

> *Youngberg v. Romeo* holds that a state may not restrain residents of institutions for the retarded or the mentally ill except when and to the extent that professional judgment deems this necessary for the reasonable safety of residents and personnel within the institution, or to provide needed training or treatment ... In our last opinion we concluded that a remand was required for consideration of Scott's claim that he should be assigned to some less restrictive setting in the

Trenton Psychiatric Hospital. Under the standard announced in *Youngberg v. Romeo* such a remand is obviously still required.

*Scott,* 691 F.2d at 638.

I do not believe that the Second Circuit's decision in *Society for Good Will to Retarded Children v. Cuomo*, 737 F.2d 1239 (2d Cir.1984) compels a different conclusion. In that case, the court reversed a decision of the district court which found that individuals institutionalized at a New York state school had been deprived of due process when the defendants failed to provide enough community placements. The Second Circuit reversed this holding. The basis of the reversal makes clear, however, the ways in which *Society for Good Will* and the instant case are distinguishable. The district court's decision that plaintiff's rights had been violated was based on a decision that the residents of the institution had a right to live in a setting that provided them with training while being least restrictive of their liberties. 737 F.2d at 1247. The "least restrictive environment analysis" rested on expert testimony at trial which contradicted the treatment decisions made by institution staff and on a state law right to care and treatment. The Second Circuit found the latter ground foreclosed by *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). It found that the former basis inconsistent with *Youngberg's* direction to defer to the opinions of treating professionals. It found that the district court had erred in relying on the testimony of expert witnesses to rebut the professional treatment decisions. The Second Circuit interpreted *Youngberg* as holding that such testimony could only be relevant to determine whether the treatment decisions made were within acceptable limits. 737 F.2d at 1248–49. In the instant case I have deferred completely to

---

**14.** I need not decide whether the professional judgments made in plaintiff's case "fall within the scope of professional acceptability." *Woe v. Cuomo*, 729 F.2d at 105. The professional judgments, as opposed to the bureaucratic or administrative judgments, all unanimously support plaintiff's transfer to a CLA. The decisions that were made (or more properly not made) simply ignored these professional judgments.

the treatment opinions made by plaintiff's treating professionals. These treatment decisions were never implemented for reasons unrelated to professional assessments of plaintiff's needs. Thus, I conclude that *Society for Good Will* is not unpersuasive.

I have reviewed plaintiff's constitutional claims with great care. I conclude that her fundamental right to liberty has been denied without due process. I also conclude that she has been institutionalized at Laurelton since at least 1976 in violation of her substantive rights under the due process clause.[15]

## D. Relief

██ The last issues I must address are those related to the relief plaintiff is seeking. Defendants raise a number of arguments concerning the propriety of the injunctive relief plaintiff seeks. Specifically, they argue that injunctive relief is improper because plaintiff is really seeking "compensation" for past wrongs. In addition they argue that they cannot be ordered to provide plaintiff with a CLA because there are no funds available to pay for one. Both of these arguments are without merit.

The dispute over relief boils down to a basic disagreement over what plaintiff seeks through this injunction and what she has sought to demonstrate in order to obtain the desired relief. Plaintiff has alleged, and proven, that she has been the victim of numerous constitutional violations in the past. She has also alleged, and proven, that she has been the victim of constitutional violations that are ongoing in nature. These ongoing violations are of both procedural due process and substantive due process.

Defendants argue, however, that plaintiff is really seeking some form of compensatory damages in this motion. I disagree with this reading of plaintiff's case. As long as there are present, ongoing violations of plaintiff's constitutional rights, prospective equitable relief such as that sought by plaintiff is certainly a proper form of remedy. Defendants' argument in this regard is tantamount to saying that no constitutional violation is subject to equitable relief.

Defendants rely on *Jaffee v. United States*, 592 F.2d 712 (3d Cir.), *cert. denied*, 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979). In that case, plaintiff asserted a tort claim against the federal government. The facts of that case, although interesting, are not relevant here. Plaintiff therein sought, *inter alia*, an injunction ordering the government to provide him with prompt medical care and necessary treatment. The Third Circuit recognized this claim for what it was: a traditional form of tort damages wrapped up as a request for equitable relief. It therefore affirmed the district court's dismissal of this count of plaintiff's complaint.

The distinctions between *Jaffee* and the instant case are obvious. Plaintiff herein is the victim of ongoing constitutional violations. Although she may receive money damages in compensation for these violations at the trial of this matter, the violations will not be cured unless and until defendants act to remedy them. It is only through equitable relief that plaintiff can be assured that defendants will stop depriving her of her constitutional rights. I therefore find *Jaffee* completely unpersuasive.

Defendants also argue that the court cannot order that they remedy the constitutional violations identified because they lack the funds to do so.[16] I once again find this argument without merit. As an initial matter, the Commonwealth's position is not supported by the facts adduced at the hearing. The Commonwealth appropriates

---

**15.** I wish to emphasize, however, the narrowness of this holding. This case has extraordinary facts. These facts necessitate the conclusions I have reached with regard to plaintiff's constitutional claims.

**16.** It appears that although the various counties have the obligation to provide and develop CLAs, the duty to fund them rests with DPW. *See In Re Schmidt*, 494 Pa. 86, 429 A.2d 631, 634–35 (1981); *In Re Sauers*, 68 Pa.Commw. 83, 447 A.2d 1132, 1134–36 (Pa.Commw.Ct.1982).

large amounts of money each year for the provision of mental retardation services. This budget totals more than $500 million. Of that total, roughly $125 million goes to fund community placement programs. Each year money is allocated to the various counties for community placements and each year a certain amount of this allocation remains unspent at the end of the fiscal year. These carryover funds are then reallocated by DPW to other counties. There was about $4 million in carryover funds from fiscal year 1983–84. Moreover, although plaintiff has voiced her desire to be transferred to a CLA and the staff at Laurelton and at her BSU have requested such a transfer, no funds have ever been requested from the legislature to provide for this program. In spite of the fact that plaintiff and others are awaiting CLAs, DPW has not sought an increase in the funding of non-Pennhurst community placements for the next fiscal year. During the early stages of this litigation, the Commonwealth did appear willing to allocate twenty-seven community placements to Philadelphia County. These were never actually given to Philadelphia, however. Instead, they appear to have been reallocated to other counties. Finally, I must note that the financial burden of placing plaintiff into the CLA identified at the hearing is miniscule. It would cost approximately $2,000 to $10,000 per year for the first two years. After that, the professionals believe that the cost would actually be *less*

than that for keeping plaintiff at Laurelton.

Finally, defendants argument that funding constraints should prevent this court from ordering the relief sought by plaintiff is contrary to logic and law. *See Battle v. Anderson,* 564 F.2d 388, 395–96 (10th Cir. 1977), and cases cited therein.[17]

### E. Conclusion

A society is perhaps best measured by how it treats those, who through no fault of their own, are forced to rely on its mercy and generosity. The case of Carolyn Clark should make no one feel proud. Bounced from bureaucratic pillar to post, her life is a very symbol of the forgotten among us. But for the then well-intentioned intervention of the state Ms. Clark could most likely have lived an average life. Instead she has been the victim of continual constitutional violations and personal indignities. No remedy I can decree will, at this point, make her completely whole; her entire life to this point has been taken from her.

For the reasons set forth above, I conclude that plaintiff has been denied due process of law and that she has been deprived of rights guaranteed to her under the due process clause. I will therefore enjoin defendants to provide plaintiff with a CLA. An appropriate decree follows. I make the following conclusions of law.

---

17. On June 19, 1985 at approximately four o'clock p.m., the Commonwealth defendants delivered to chambers a document entitled "Suggestion of Mootness." This document was hand delivered to chambers, but served by first-class mail on plaintiff. It purports to suggest that plaintiff's claim for equitable relief is moot. The basis of this claim is that the County of Philadelphia will have available as of July 1, 1985 funding to provide fifty-four CLAs in "intermediate care facilities for the mentally retarded" for non-Pennhurst individuals. I have reviewed the defendants' memorandum carefully and see no reason to conclude that plaintiff's claim for equitable relief is moot. First, all of the information contained in the "suggestion" as well as the attached affidavit of G. David Smith is of a factual nature and has been in the hands of the Commonwealth for many months. Defendants chose not to present testimony on this

matter at the hearing and indeed there was testimony at the hearing that flatly contradicted the facts averred in the "suggestion" and attached affidavit. I see no reason to reward the Commonwealth for its own dilatory tactics. Second, all of the reasons offered by defendants in its "suggestion" are contingent upon events that may or not occur after July 1, 1985. This is June and none of the events required to moot this case have occurred. I will not deny plaintiff's claim for equitable relief based upon the defendants' conjecture regarding the future funding situation for CLAs in Philadelphia. Finally, there is no way for me to tell what an "intermediate care facility for the mentally retarded" will be. Defendants presented no evidence on this subject and I cannot at this point deny plaintiff's claim on the assumption that such facilities will be essentially the same as the CLAs discussed at the hearing.

### III. CONCLUSIONS OF LAW

1. Jurisdiction of this court is properly invoked.

2. Plaintiff has been deprived of liberty without due process of law.

3. Plaintiff has been deprived of the substantive rights guaranteed to her under the due process clause of the Fourteenth Amendment of the United States Constitution.

4. Plaintiff has not been a subject to discrimination solely by reason of her handicap in violation of the Rehabilitation Act of 1973.

5. Plaintiff is entitled to injunctive relief to remedy the present, ongoing violations of her constitutional rights.